[No. S021054. Aug. 18, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD RUSSELL MOON, Defendant and Appellant.

COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, Barry P. Helft and Craig Buckser, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Jason C. Tran, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—A jury in Los Angeles County Superior Court convicted Richard Russell Moon in 1991 of the first degree murders of Rose and Melitta Greig (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated) and one count of unlawfully driving or taking a vehicle (Veh. Code, § 10851, subd. (a)). The jury also sustained special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and that defendant had murdered Rose Greig while lying in wait (*id.*, subd. (a)(15)). In addition, the jury sustained allegations that defendant had personally used a deadly and dangerous weapon, to wit, a log, when committing the murders. (§ 12022, subd. (b).) On February 15, 1991, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).) We affirm.

I. GUILT PHASE

A. *Facts*

Robert Greig lived in Walnut with his wife, Rose, and his 22-year-old daughter, Melitta. On June 15, 1990, he returned home from work and found no one at home. He did not think this odd because his father-in-law was ill and he assumed his wife was attending to him. After taking a shower, he noticed half a dollar bill in the trash. He decided to put the half bill in a drawer where he kept some money for his business. He normally kept around $100 in the drawer, made up of stacks of 25 $1 bills bound with a paper clip. He also kept no more than $50 in rolled coins in the drawer. He discovered the drawer was empty. He then checked another desk drawer where his wife kept between $20 and $100 in household money, along with a small cache of 50-cent coins; it too was empty. Further investigation revealed that a check from his daughter's checkbook was unaccounted for.

Thinking his daughter might have used the check to buy a plane ticket to San Francisco, he went to the garage to see if her car was missing. He

noticed the bumper of his wife's car had dried blood on it; when he opened the trunk, he discovered his daughter's lifeless body inside. After calling 911, he returned to the car and discovered his wife's body was also in the car trunk. Melitta's car, a 1989 silver-gray Volkswagen Cabriolet convertible, was missing. Greig later discovered his wife's checkbook was also missing a check.

Defendant had been Melitta Greig's boyfriend when they were both 17 or 18 years old and during that period had been a frequent visitor to the Greig house. Robert Greig had not seen defendant in more than a year before the murders.

Elsa Linares worked with Rose Greig at St. Martha's Catholic Church. At 12:15 p.m. on the day of the murders, Rose Greig received a short telephone call that made her unhappy. She told Linares she was going home but that she would be back.

Terry de la Paz had been defendant's girlfriend, but by the time of the crimes they were no longer romantically involved. Around 2:00 p.m. on the day of the murders, defendant appeared at her home unannounced and asked her about some tickets to a Phil Collins concert they had discussed. She told him she had already given them away. She noticed he had a cut on his right hand and red spots on his shoes. He drove a gray Volkswagen convertible.

Later that evening, defendant's softball team had a series of playoff games scheduled. When Marcos Urrutia, one of defendant's teammates, arrived at the field around 6:20 p.m., he found defendant already there, warming up. Urrutia did not notice anything different about defendant, but defendant told him he would not be able to play on the team anymore. Dennis Soiffer played for one of the opposing teams that evening. He was defendant's friend and had lent him some equipment that night when defendant said he had been locked out of his apartment. Soiffer noticed a gray Volkswagen Cabriolet convertible without license plates in the parking lot.

Priscilla Candellari had rented defendant an apartment earlier that week but changed the lock on the apartment when defendant failed to pay any rent. The day after the murders, defendant returned to the apartment sometime around midday to retrieve his belongings.

Around 6:50 p.m. the day after the murder, police located Melitta's missing car, parked at a local motel. Both license plates had been removed, but police confirmed it was her automobile by checking the vehicle identification number. Defendant was registered at the motel but was not present. Police

searched his motel room and found a gym bag with rolls of coins, stacks of 25 $1 bills bound with paper clips, nine or 10 half-dollar coins, and the two missing checks. One check was made out to defendant for $1,000 and purportedly signed by Melitta Greig; the memo line of the check said "loan pay back." Defendant later admitted he had forged the check.

That evening around 8:30 or 9:00, defendant called a former girlfriend, Cameron Wood, and asked her to pick him up in front of a local grocery store. She agreed. Once in the car, defendant told her he needed to go to Seattle, Washington, to help his father, who was in trouble with the police. She agreed to loan him some money and drive him to the Fullerton Amtrak station. Finding the train to Seattle booked, she bought him a train ticket to Union Station in Los Angeles, where he could transfer to a bus that would take him as far as Bakersfield or Fresno. When Wood returned home, she learned that police had been in contact with her mother and were looking for defendant. She told the police defendant would be waiting for a bus at Union Station. Police arrested defendant there. He had purchased two books to read on his trip; their titles were Thou Shalt Not Kill and Dial M for Murder.

Police searched the Greigs' garage and found a log with blood on it. Another bloody log was found in the car trunk with the victims. In addition, police found a ball peen hammer that was determined to have been used by the killer. Defendant's fingerprints were on the rear of the car in which the bodies were found.

The medical examiner determined Melitta Greig died from multiple head and neck injuries. She had a two-and-one-half-inch laceration to her head, and her face had been crushed by a log. Her wounds were also consistent with having been struck several times with the ball peen hammer. Rose Greig bore similar wounds; in addition, she had been strangled. The injuries to her neck indicated she was strangled by the application of a board or other rigid object being pressed on her neck with great force.

The parties stipulated that defendant had recently attempted to buy a car from a dealer, but his check had been dishonored for insufficient funds. In addition, in June or July 1989, defendant had borrowed $5,000 from Mary Giordano, Rose Greig's mother and Melitta Greig's grandmother, because a bank had attempted to repossess his car. He had repaid only $200 of the loan and had given Giordano a check that was dishonored for insufficient funds. Nevertheless, defendant often visited Giordano, even after he broke up with her granddaughter, Melitta. In fact, defendant had dinner in her home the night before the murders.

Defendant confessed to the police that he had killed both victims, and a tape recording of his confession was played for the jury. He also testified at trial and admitted the killings. He said he loved Melitta, but she did not want to be his girlfriend. He went to her house on June 15, 1990, in order to borrow a biology book to use for a class. His knocking woke her up; she pointed him to a bookcase and went back upstairs to sleep. When he could not find the book, he waited in the house and watched television until she woke again. It was during this time that he stole the money and the checks. He had not been intending to steal when he first came to the house. When Melitta came back downstairs sometime later and he told her he could not find the book, she said she probably had sold it. When she noticed he had stolen the money, she became angry. He left the house but returned a few minutes later, entering the unlocked door without knocking. Melitta, still angry, called him a "lying cheat," and said that he would "never amount to anything" and that she had called her mother "and she's on the way home." Defendant pushed her to get her attention, but she fell down the stairs. She appeared to be going in and out of consciousness. He then choked her with his hands, though he did not know why he did so. He hit her with the log but did not recall hitting her with the hammer.

Defendant then heard Melitta's mother arrive. He stayed down in the garage while Rose Greig went upstairs to the bedrooms, calling her daughter's name. Defendant went up to the living room while Rose came down to the kitchen. When he met her at the top of the stairs, she asked him what had happened. Instead of responding, he pushed her down the stairs. He then choked her but denied hitting her with the log or the hammer. He could not explain the wounds on her body that were consistent with having been struck with the log and the hammer.

After the murders, defendant went to Terry de la Paz's house to ask her about the concert tickets. He was going to talk to her about what had happened but changed his mind. He checked into the motel in the afternoon and played in the softball games that evening, explaining that "[w]hen I make a commitment to somebody, I like to keep it." After the games, he returned to the motel, showered, and slept.

The next morning, defendant called Candellari and decided to retrieve his belongings when she told him he would have to leave the apartment. He was eating dinner at a Denny's Restaurant across the street from the motel when he saw the police converge on the motel. He left the restaurant and walked to the grocery store. He admitted he had originally lied to the police about

stealing the money, explaining that he "didn't know it was going to be such a big issue of the whole case."

On cross-examination, defendant admitted that shortly before the murders, he had written a check for $3,000 or $4,000 to buy a Toyota truck, although he did not have that much money in his account. He had hoped he could borrow the money from someone to cover the check. He drove the truck away, and it was later repossessed. Just two days before the murders, he had written a check for almost $10,000 in order to obtain a car, although he had insufficient funds to cover that check as well. He claimed he did not intend to push Melitta down the stairs and did not remember what was going through his mind at the time of the crime. He could not remember what he was thinking when he choked Melitta or hit her with the log, though he knew he was killing her. He similarly could not remember what was going through his mind when he killed Rose Greig. He knew he had killed her.

B. *Jury Selection Issues*

1. *Excusing Prospective Juror P.C. for Cause*

Defendant contends the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under article I, sections 7, 15, 16, and 17 of the California Constitution by granting the prosecutor's challenge for cause to Prospective Juror P.C. due to her views on capital punishment. As we explain, this claim lacks merit.

We have often reiterated the applicable legal rules: "In *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the United States Supreme Court held that a prospective juror cannot be excused for cause based on his or her views on capital punishment without violating a defendant's right to an impartial jury under the Sixth Amendment, unless, as is pertinent here, the prospective juror made it 'unmistakably clear' that he or she would '*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . .' (*Id.* at p. 522, fn. 21.) In *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, the court revisited *Witherspoon* and declared that the proper standard was 'whether the [prospective] juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Id.* at p. 424.) In *People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], we adopted the *Witt* standard as the test for determining whether a defendant's right to an impartial jury under article I, section 16 of the state Constitution was violated by an excusal for cause based on a prospective juror's views on capital punishment." (*People v. Griffin* (2004) 33 Cal.4th 536, 558 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

■ " 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.] "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. [Citations.]" [Citation.]' " (*People v. Boyette* (2002) 29 Cal.4th 381, 416 [127 Cal.Rptr.2d 544, 58 P.3d 391], quoting *Wainwright v. Witt, supra*, 469 U.S. at p. 424, and *Morgan v. Illinois* (1992) 504 U.S. 719, 729 [119 L.Ed.2d 492, 112 S.Ct. 2222].)

Although we thus apply a substantial evidence test on appeal, we defer to the trial court's assessment of the juror's state of mind. "As we explained in *People v. Cain* (1995) 10 Cal.4th 1, 60 [40 Cal.Rptr.2d 481, 892 P.2d 1224]: '[W]e pay due deference to the trial court, which was in a position to actually observe and listen to the prospective jurors. Voir dire sometimes fails to elicit an unmistakably clear answer from the juror, and there will be times when "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." ' (Quoting *Wainwright v. Witt, supra*, 469 U.S. [at p.] 426.)" (*People v. Griffin, supra*, 33 Cal.4th at p. 559.)

At the threshold, defendant contends "[t]his Court's practice of giving *absolute deference* to the trial court's decision to remove for cause a prospective juror who gives equivocal answers at voir dire . . . flouts United States Supreme Court precedent." (Italics added.) Although he cites *Gray v. Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045] in support, that case is inapposite for two reasons. First, the issue there was not the standard for excusing a juror for cause, but whether the erroneous excusal of a juror for cause was subject to a harmless error test. Second, *Gray* posed a unique situation not present here. In *Gray*, the trial judge denied several of the prosecutor's challenges for cause, leading the prosecutor to excuse those jurors by exercising peremptory challenges, eventually exhausting all of his allotted peremptory challenges. The court, apparently arriving at the belated realization it had erroneously denied some of the prosecutor's for-cause challenges, thereafter excused a juror for cause who did not meet the standards for excusal under *Wainwright v. Witt, supra*, 469 U.S. 412. Due to

the trial judge's apparent ulterior motives in that case, deference to his decision obviously was not appropriate. Nothing in *Gray* suggests the high court intended to cast aside its view that "deference must be paid to the trial judge who sees and hears the juror." (*Wainwright v. Witt, supra*, at p. 426.)

Turning to the merits of defendant's claim, we conclude the trial court did not err in excusing Prospective Juror P.C. When asked on her jury questionnaire about her feelings regarding the death penalty, she responded that it was "extreme, beyond God's judgment." Asked in the questionnaire whether there were any types of crimes deserving of the death penalty, she replied: "I don't know. It depend[s]." Examined in court by the prosecutor, she asserted on voir dire that she would always vote against finding a special circumstance allegation true so as to avoid the death penalty question. She would also vote against the death penalty "regardless of the evidence." Asked by defense counsel whether there were some cases in which she "could be convinced that the death penalty might be appropriate," she replied: "Yes. Might." Asked whether she could weigh all the evidence and come to the "appropriate" verdict, she answered in the affirmative. When asked by the prosecutor, however, whether she could think of "any case" in which she could vote for the death penalty, she replied: "I can't think of anything [for which the] death penalty should be imposed." Similarly, she could think of no facts that would cause her to impose the death penalty and could not "conceive of a way [in which she] would give the death penalty." Paradoxically, she also asserted that she could "fairly, impartially decide" whether the death penalty should be imposed and "would look at the evidence" and "would vote for the death penalty."

Once the juror left the courtroom, the prosecutor challenged her for cause, asking whether the court thought she could be fair to both sides. The court answered: "No, I really don't, in candor. And the record will show she goes back and forth. . . . I was the last one who asked the questions and she responds to certain words. Whenever the word 'fairness' comes in, she insists she's fair regardless of what she said before. [¶] We really do want independent thinkers, someone who is going to think about the issues in this case. I am just of the belief that ultimately she's not going to be fair to both sides and you are both entitled to a free and unbiased jury. [¶] I am going to sustain [the prosecutor's] objection."

█ It is not surprising that the juror was less than consistent in her answers. "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's

evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].) We find substantial evidence supports the trial court's decision that Prospective Juror P.C. would have been " 'unable to faithfully and impartially apply the law in the case.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

### 2. *Alleged* Caldwell *Error*

In *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*), the Supreme Court established the rule that "a death sentence may not rest on a determination made by a sentencer who has been affirmatively misled to believe the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere." (*People v. Stanley* (1995) 10 Cal.4th 764, 827 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Defendant contends the prosecutor committed *Caldwell* error when, during the voir dire examinations of two jurors, both of whom ultimately served on the jury, he made comments suggesting the ultimate responsibility for deciding on the appropriate penalty lay elsewhere. Defendant also contends the trial court similarly erred when speaking to the jury later in the trial. Although we find defendant is not precluded from raising the issue on appeal despite his failure to object, we conclude his claim of *Caldwell* error is meritless.

During the voir dire examination of Prospective Juror A.B., the prosecutor explained the general framework of the two-part trial and then said: "During [the] penalty phase the jury will have the option of voting either for the death penalty or for life without parole. *The jury can only recommend a death sentence to the court* if all 12 members of the jury vote for the death sentence." (Italics added.) Defendant did not object. Later, during the voir dire examination of Prospective Juror J.D., the prosecutor stated: "[A] death penalty can only be *sent back to the court for the court to consider* if all 12 people unanimously agree to recommend the death sentence." (Italics added.) Again, defendant did not object. The examination of each juror was conducted individually, during the *Hovey* voir dire (see *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]), out of the presence of other prospective jurors.

Following the guilt phase, the trial court asked the jurors to return their written copies of the guilt phase instructions, explaining it would deliver new instructions applicable to the penalty phase. The court then stated: "Do you all understand that? It's just so we don't get confused with the instructions. *It's very important that we do it the right way, otherwise we do it again, later on.*" (Italics added.) Defendant did not object to this comment.

### a. *Failure to Object*

The parties acknowledge defendant failed to object to any of the three incidents of alleged *Caldwell* error but disagree as to the legal consequence of such failure. Their disagreement is understandable, for candor requires we admit our own inconsistency on this subject. The issue first arose in *People v. Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659] (*Bittaker*). In that case, the defendant argued that the prosecutor, by making certain comments in closing argument at the penalty phase, had committed *Caldwell* error. The respondent contended that the defendant had failed to preserve the claim because he failed to object. We rejected that argument without explanation, stating: "We have never required an objection to raise claims of error based upon *Caldwell* v. *Mississippi*[, *supra*,] 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]." (*Bittaker, supra*, at p. 1104.) We thereafter often cited *Bittaker* with approval on this point (see *People v. Clark* (1993) 5 Cal.4th 950, 1035 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People v. Cain, supra*, 10 Cal.4th at p. 55; *People v. Jackson* (1996) 13 Cal.4th 1164, 1238 [56 Cal.Rptr.2d 49, 920 P.2d 1254]) but sometimes found the issue forfeited on appeal for lack of a trial objection (*People v. Stanley, supra*, 10 Cal.4th at p. 828; *People v. Freeman* (1994) 8 Cal.4th 450, 523 [34 Cal.Rptr.2d 558, 882 P.2d 249]).

We recognized the tension surrounding this issue in *People v. Cain, supra*, 10 Cal.4th at page 55, footnote 20, noting: "We have held claims of *Caldwell* error fall within an exception to this rule of waiver. [Citing *Bittaker*.] The reason for this exception is not articulated in *Bittaker*, but it could be argued that when the court itself has referred to impermissible and prejudicial considerations an objection is likely to be futile, and in many cases may tend to aggravate the error's effect. Because of the potential difficulty of determining whether the waiver doctrine should apply in this case, we assume defendant has preserved this particular point, and treat it on the merits." We then addressed and rejected the merits of the claim.

We recently reconciled these divergent lines of authority in *People v. Cleveland* (2004) 32 Cal.4th 704 [11 Cal.Rptr.3d 236, 86 P.3d 302], where, after identifying the problem, we explained: "On reflection, we see no reason to carve out an exception to the general rule that a defendant must object to misconduct at trial to raise the claim on appeal. [Citation.] If the prosecutor improperly suggests the responsibility for a death verdict rests elsewhere, an admonition could normally cure any harm. [Citation.] We believe, therefore, that a defendant should be required to object to this type of misconduct just as to any other type of misconduct. [Citation.] Accordingly, in all trials held after this decision becomes final, a defendant will be required to object to prosecutorial misconduct on this basis in order to raise the issue on appeal." (*Id.* at p. 762.)

As defendant's trial did not postdate our decision in *People v. Cleveland, supra*, 32 Cal.4th 704, his case is controlled by the no-waiver rule in *Bittaker, supra*, 48 Cal.3d at page 1104. Accordingly, we find his failure to object does not preclude review of this issue on appeal.

b. *Discussion*

Turning to the merits of defendant's claim, we find neither the prosecutor's comments nor the trial court's isolated remark rendered it even remotely possible that the jury understood the ultimate responsibility for the penalty determination lay elsewhere. Immediately after informing Prospective Juror A.B. that the jurors would have to unanimously "recommend" a death sentence before it could be accepted by the court, the prosecutor opined that "each and every one of those jurors will have to take personal responsibility for returning a death verdict," and asked her: "[W]ould you be able to personally take the responsibility of imposing a death sentence if it's otherwise justified by the law?" The prosecutor similarly emphasized the personal nature of the penalty decision to Prospective Juror J.D.

In closing argument, both the prosecutor and defense counsel emphasized the personal responsibility of the jurors. The trial court's penalty phase instructions similarly emphasized the jury's responsibility and made no mention of the trial court's ability to modify the verdict or of defendant's right to appeal. "No reasonable juror, after hearing the rest of the prosecutor's argument, the defendant's argument, and the trial court's instructions, would have been mistaken as to the jury's role as the arbiter of defendant's fate." (*People v. Welch* (1999) 20 Cal.4th 701, 763 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Although the use of the word "recommend" created the potential for misunderstanding and should be avoided in this context, we conclude that, considering the totality of the circumstances here, the prosecutor's mere use of the word "recommend" (in stating that only a unanimous jury can "recommend" a death sentence), does not require reversal. (*People v. Fauber* (1992) 2 Cal.4th 792, 846–847 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

 We reach the same conclusion with regard to the trial court's remark that the jury must "do it the right way, otherwise we do it again, later on." Contrary to defendant's assertion that the court was referring to the possibility of appellate review of the penalty verdict, we find the court's comment cryptic. Considering the comment together with the parties' closing argument and the penalty phase instructions convinces us the jury could not reasonably have understood the court to mean the jury's verdict was advisory only. Certainly the mere mention of the appellate process, while ill-advised, does not—standing alone—necessarily constitute reversible *Caldwell* error. (*People v. Mendoza* (2000) 24 Cal.4th 130, 186–187 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Accordingly, we conclude neither the prosecutor's two voir dire comments nor the trial court's single remark requires reversal. We also reject defendant's claim that "the combination of the comments had a synergistic effect such that the jurors were left with the impression that their verdict was [advisory only]."

C. *Trial Issues*

1. *Waiver of Right to Be Present at the Jury View of the Crime Scene*

The jury was taken to the scene of the crime to view the premises. Prior to the jury view, the following colloquy occurred:

"[DEFENSE COUNSEL]: . . . as to the viewing of the scene, it's [defendant's] desire to waive his presence on the bus which is driven to the scene and then back. It's been my experience in the past that the defendant doesn't even get off the bus in any case.

"THE COURT: That's fine, if he wants to avoid going out there.

"Mr. Burns [the prosecutor]?

"[THE PROSECUTOR]: I have no objection to him waiving, but I do believe because this is a death penalty offense he must make that personal waiver on the record.

"THE COURT: Do you want to make a personal request?

"[DEFENSE COUNSEL]: Mr. Moon, is it agreeable with you that you not be taken out to the scene on the bus and that you don't view the scene while the court, the jury and the attorneys go out to view the scene? Basically you remain in lockup here at the courthouse.

"THE DEFENDANT: Yes.

"THE COURT: Is that what you want?

"THE DEFENDANT: Yes.

"THE COURT: That's fine.

"[THE PROSECUTOR]: People have no objection."

■ Defendant contends the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution by permitting him to absent himself from the jury's view of the crime scene because his purported waiver was invalid. In addition, he contends his absence violated section 977, subdivision (b)(1) because his waiver was not in writing, accomplished in open court. In support of the constitutional claim, defendant begins with the indisputable proposition that he is constitutionally entitled to be present at all critical stages of his criminal trial (*Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 107 S.Ct. 2658]; *People v. Coddington* (2000) 23 Cal.4th 529, 629 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]) and, noting that a jury receives evidence when it views a crime scene (*People v. Bolin* (1998) 18 Cal.4th 297, 325 [75 Cal.Rptr.2d 412, 956 P.2d 374]), reasons that such viewing constitutes a critical stage of the trial. From this, he concludes he had a federal constitutional right to be present at the jury view. He is mistaken: "Although the federal Constitution requires a criminal defendant to be present at those stages of trial at which his absence might detract from the fairness of the proceedings [citation], it does not require the defendant's presence at a jury view (*Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 117–118 [78 L.Ed. 674, 54 S.Ct. 330])." (*People v. Lang* (1989) 49 Cal.3d 991, 1025 [264 Cal.Rptr. 386, 782 P.2d 627].) While "[u]nder our state law, a defendant has a right to be present at a jury view [citation] . . . the right may be waived [citations]. Even in capital cases, moreover, the United States Supreme Court has never held that a defendant cannot waive the constitutional right to be present at critical stages of the trial, and we have expressly recognized the validity of such waivers as a matter of state constitutional law." (*People v. Lang, supra*, at pp. 1025–1026; see also *People v. Roberts* (1992) 2 Cal.4th 271, 306 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

Defendant contends his waiver was invalid because, although he stated in open court (and with the assistance of counsel) that he did not wish to attend the jury view, no showing was made that he understood the nature of the right he was waiving. Thus, he claims "[t]he record is silent as to whether counsel had discussed with [him] the meaning of the right involved or the potential consequences of waiving this right. Nor does the record contain anything from which one could infer that the waiver of presence at the crime scene was knowing and intelligent." Defendant also claims: "[T]he waiver of a constitutional right must be a voluntary, knowing, and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences."

We rejected this precise argument in *People v. Weaver, supra*, 26 Cal.4th 876. Discussing the claim, raised in that case, that the defendant's waiver of

his right to be present in the courtroom was invalid because he had not been advised of the importance of his personal presence, we explained that he "cites no authority for his argument that we must apply a heightened waiver standard under the circumstances, or that the trial court had a sua sponte duty to admonish him of the importance of his decision to absent himself from the [proceedings]. Defendant was represented by counsel, and he himself chose, for his own reasons, to [absent himself]. We find nothing improper about the procedure used, and we conclude defendant's waiver of his state and federal constitutional right to be present at this phase of his capital trial was both voluntary, knowing and intelligent." (*Id.* at p. 967.)

As in *People v. Weaver*, we find nothing to suggest defendant's waiver of his right to attend the jury view of the crime scene was other than knowing and intelligent. To the extent he now contends his waiver was invalid because he believed he was waiving only the right to ride on the bus, not the right to actually be present at the jury view, we reject that suggestion, both because he failed to raise an objection on this ground at trial and because it is inconsistent with a reasonable reading of the record. Moreover, to the extent defendant now contends the trial court bore a special duty to conduct a more searching substantive inquiry regarding his understanding of his waiver, we reject the claim as both forfeited by a failure to object and because it is legally unsupported. (*People v. Weaver, supra,* 26 Cal.4th at p. 967.)

▪ Turning to defendant's statutory claim, we find defendant similarly fails to establish entitlement to relief. We previously explained in *People v. Weaver, supra,* 26 Cal.4th at pages 967–968, that a capital defendant's ability to waive the right to be present at trial is severely limited by statute. (See § 977.) But even assuming the court committed error by accepting defendant's waiver, any error was statutory only and thus "is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error." (*People v. Riel* (2000) 22 Cal.4th 1153, 1196 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Because defendant provides no basis on which one could conclude the result of his trial would have been different had he attended the jury view, we find any violation of section 977 was harmless.

### 2. *Alleged Insufficient Evidence of Lying in Wait*

Defendant next contends the evidence was insufficient to show that he lay in wait before killing Rose Greig. Because the jury may have relied on evidence of lying in wait to conclude Rose Greig's murder was in the first degree, he argues his conviction for her murder was obtained in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution as well as article I, section 13 of the California Constitution. He likewise claims the lying-in-wait special-circumstance finding suffers from the same constitutional flaw. We disagree.

■ We often address claims of insufficient evidence, and the standard of review is settled. "A reviewing court faced with such a claim determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357], quoting in part *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

■ The applicable principles are set out in *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708]. "The requirements of lying in wait for first degree murder under Penal Code section 189 are 'slightly different' from the lying-in-wait special circumstance under Penal Code section 190.2, subdivision (a)(15). [Citation.] . . . We focus on the special circumstance because it contains the more stringent requirements. [Citation.] If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder. [¶] The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.] 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' [Citation.]" (*Id.* at p. 388; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 500 [117 Cal.Rptr.2d 45, 40 P.3d 754] [quoting *Carpenter* with approval].)

■ Defendant's own testimony at trial establishes the three elements of the lying-in-wait special circumstance. He testified he was in the Greigs' home when Rose Greig arrived and entered through the side door. Though he was well known to Rose Greig, defendant made no effort to reveal his presence. He remained out of her view in another part of the house as she went upstairs to look for Melitta, checking both bedrooms and calling Melitta's name. He thereby concealed both his presence and his purpose as he waited and watched for an opportune moment to attack her. When Rose came downstairs to the kitchen, defendant apparently came up to the living room on the same level, again concealing his presence and waiting. When Rose saw him and asked him what had happened, he remained silent, further concealing his purpose. The victim could not have anticipated defendant's deadly intentions. He suddenly pushed her down the stairs and then strangled

her, satisfying the element of a sudden or surprise attack on an unsuspecting victim. Viewing these facts in a light most favorable to the party who prevailed below, i.e., the People, we find sufficient evidence of the lying-in-wait special circumstance.

Defendant argues that because he testified that he waited only about 90 seconds after Rose Greig returned home before he killed her, the evidence was insufficient to show that the watching and waiting was for "a substantial period of time." Although we have held the period of watchful waiting must be "substantial" (*People v. Hillhouse, supra,* 27 Cal.4th at p. 500), we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that "[t]he precise period of time is also not critical." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1145 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Even accepting defendant's testimony that he waited only a few scant minutes before killing Rose Greig, a few minutes can suffice. (*People v. Edwards* (1991) 54 Cal.3d 787, 825–826 [1 Cal.Rptr.2d 696, 819 P.2d 436] [wait was only "a matter of minutes"]; *People v. Superior Court (Lujan)* (1999) 73 Cal.App.4th 1123 [87 Cal.Rptr.2d 320] [two minutes sufficed].)

We approved a jury instruction codifying this concept in *People v. Edwards, supra,* 54 Cal.3d 787. In that case, "the jury was told that the lying in wait must be of sufficient duration to establish the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise, and that a murder done suddenly without such waiting, watching and concealment is not murder by lying in wait. These requirements necessarily include a substantial temporal element. *We have never required a certain minimum period of time, only a period not insubstantial.*" (*Id.* at p. 823, italics added.) Based on our discussion in *Edwards,* the standard CALJIC instruction for this issue states that "[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." (CALJIC No. 8.25.) The standard CALJIC instruction for the lying-in-wait special circumstance states the same. (CALJIC No. 8.81.15.1.) Both instructions were given to defendant's jury.

It seems unlikely in any event that defendant's account that he waited only 90 seconds for Rose Greig was accurate. According to defendant's testimony, when he reentered the Greigs' home, Melitta told him she had called her mother and that her mother was returning to the home (an assertion consistent with the later testimony of Rose Greig's coworker, Elsa Linares). Apprised of this information, defendant admitted waiting in the house while Rose Greig drove home, parked, entered the home, searched the upstairs portion of the house for her daughter, came downstairs to the kitchen, and then encountered

defendant. Based on these facts, the jury could have reasonably inferred that defendant, after killing Melitta, resolved to await Rose's arrival in order to kill her also, so as to eliminate the only witness who could place him in the Greig home that day, linking him to Melitta's murder. Although the period of waiting was relatively short, it was sufficient to negate any inference defendant's murder of Rose Greig was the result of panic or sudden impulse. Rather, the evidence shows the time defendant remained in the house awaiting Rose Greig, following his murder of Melitta Greig, was "of sufficient duration to establish the elements of waiting, watching and concealment or other secret design to take the victim unawares and by surprise . . . ." (*People v. Edwards*, *supra*, 54 Cal.3d at p. 823.)

Defendant also contends there was insufficient evidence he attacked Rose Greig from a position of advantage. We disagree, for the jury could reasonably have found defendant hid his presence in the home until the victim was positioned at the top of the stairs, making her more vulnerable to being rushed and pushed down the stairs. Moreover, because the victim was well acquainted with defendant, she would not immediately have suspected she was in danger merely because she discovered him in the house. (See *People v. Morales* (1989) 48 Cal.3d 527, 555 [257 Cal.Rptr. 64, 770 P.2d 244] ["the concealment element 'may manifest itself . . . by the creation of a situation where the victim is taken unawares *even though he sees his murderer*' "].)

We thus reject defendant's contentions that the evidence was insufficient to prove a substantial period of watchful waiting and that he struck from a position of advantage. Having found substantial evidence supports the lying-in-wait special-circumstance allegation, we also conclude there was substantial evidence to support the lying-in-wait theory of first degree murder.[1]

### 3. *Failure to Instruct on Joyriding as a Lesser Included Offense*

Defendant contends the trial court erred by failing to instruct sua sponte on joyriding (Pen. Code, former § 499b, as amended by Stats. 1983, ch. 1092, § 289, p. 4045) as a lesser offense included in the greater crime of unlawfully taking or driving the victim's car (Veh. Code, § 10851). He contends this

---

[1] " '[M]urder by means of lying in wait requires only a wanton and reckless intent to inflict injury likely to cause death. [Citations.]' [Citation.] In contrast, the lying-in-wait special circumstance requires '*an intentional murder*, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148–1149 [124 Cal.Rptr.2d 373, 52 P.3d 572], fn. omitted, italics added.) Having just killed Melitta Greig in the same way, the jury could easily infer from the circumstances that his murder of Rose Greig was intentional.

alleged error violated his right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. Because the parties presented insufficient evidence to trigger the court's duty to instruct on joyriding as a lesser included offense, no sua sponte duty to instruct on joyriding arose.

The information charged defendant with the first degree murders of Melitta and Rose Greig. In addition, it charged that "[o]n or about June 15, 1990, . . . the crime of UNLAWFUL DRIVING OR TAKING OF A VEHICLE, in violation of VEHICLE CODE SECTION 10851(a), a Felony, was committed by RICHARD RUSSELL MOON, who did willfully and unlawfully drive and take a certain vehicle, to wit, a VW Cabriolet . . . then and there the personal property of MELITTA GREIG without the consent of and with intent, either permanently or temporarily, to deprive the said owner of title to and possession of said vehicle." Accordingly, the jury was instructed with CALJIC No. 14.36, relating to Vehicle Code section 10851, subdivision (a).[2] Defendant did not request the jury be instructed on joyriding as a lesser included offense.

Trial courts are often called upon to decide whether, in the absence of a request, they must instruct a jury on lesser included offenses, so it is no surprise that the rules governing this situation are well settled: "A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citations.] This sua sponte obligation extends to lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense.' " (*People v. Lopez* (1998) 19 Cal.4th 282, 287–288 [79 Cal.Rptr.2d 195, 965 P.2d 713].)

We employ two alternative tests to determine whether a lesser offense is necessarily included in a greater offense. Under the elements test, we look to see if all the legal elements of the lesser crime are included in the definition of the greater crime, such that the greater cannot be committed without committing the lesser. Under the accusatory pleading test, by contrast, we look not to official definitions, but to whether the accusatory pleading describes the greater offense in language such that the offender, if

---

[2] CALJIC No. 14.36 provides: "Every person who drives or takes a vehicle not [his] own without the consent of the owner and with the specific intent to deprive the owner either permanently or temporarily of [her] title to or possession of the vehicle is guilty of a violation of Vehicle Code § 10851, a crime. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person took or drove a vehicle belonging to another person; [¶] 2. The other person had not consented to the taking or driving of [her] vehicle; and [¶] 3. When the person took or drove the vehicle, [he] had the specific intent to deprive the owner either permanently or temporarily of [her] title to or possession of the vehicle."

guilty, must necessarily have also committed the lesser crime. (*People v. Lopez, supra,* 19 Cal.4th at pp. 288–289.)

Vehicle Code section 10851, subdivision (a) provides that a person is guilty of a crime if he or she "drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle." By contrast, Penal Code former section 499b, the joyriding statute at the time of defendant's crime, provided: "Any person who shall, without the permission of the owner thereof, take any automobile . . . for the purpose of temporarily using or operating the same, shall be deemed guilty of a misdemeanor . . . ." (Stats. 1983, ch. 1092, § 289, p. 4045.)[3]

We explained the distinction between these two crimes in *People v. Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243]: "The principal difference between them is that [Vehicle Code] section 10851 requires a driving or taking with the specific intent to deprive the owner permanently or temporarily of title or possession of the automobile [citation]. Penal Code [former] section 499b, the joyriding statute, does not require a specific intent to deprive the owner of title or possession of a vehicle [citations]. However, the section does require a 'purpose' or 'intent' of 'temporarily using or operating the same.' [Citation.] [¶] Because one could conceivably 'take' a vehicle in violation of section 10851 without the purpose of using or operating it in violation of section 499b, the latter is not a necessarily included offense under section 10851." (*Id.* at p. 134, fns. omitted.) Accordingly, joyriding is not a lesser included offense under the elements test.

Because he was charged with unlawfully driving "and" taking the victim's car, however, defendant contends the alleged violation of Vehicle Code section 10851 included the lesser offense of joyriding under the accusatory pleading test. Here he is on firmer ground. "[A] complaint which charges a defendant with 'driving and taking' an automobile necessarily charges that he took the automobile 'for the purpose of temporarily using or operating the same' and thus violated section 499b." (*People v. Barrick, supra,* 33 Cal.3d at p. 135.)

Although joyriding was a lesser included offense under the accusatory pleading test, we nevertheless conclude no sua sponte duty to instruct on

---

[3] Former section 499b was amended in 1996, and "[t]he legislative intent behind [the] amendment '[was] to clarify and streamline existing law by deleting provisions in Section 499b of the Penal Code that are generally duplicative of provisions in subdivision (a) of Section 10851 of the Vehicle Code.' (Stats. 1996, ch. 660, § 3 [Assem. Bill No. 3170].)" (*People v. Howard* (1997) 57 Cal.App.4th 323, 326, fn. 2 [66 Cal.Rptr.2d 849].)

joyriding arose. The evidence defendant intended to deprive Melitta Greig of her car permanently was overwhelming, and the evidence he merely intended to drive it temporarily and then return it to her was virtually nonexistent. At the threshold, we note that defendant killed Melitta Greig, indicating he did not intend to return the car to her. In addition, he removed the license plates from the car; a reasonable inference is that he did so to impede the victim's family from recovering the vehicle. Finally, his repeated efforts to acquire a car of his own notwithstanding his inadequate finances suggested his desire to acquire a car at any price and constituted circumstantial evidence of his probable intent to keep the victim's car permanently.

Defendant emphasizes the evidence that he did not drive the car far from the scene of the crime, that he stayed in the general area, and that he took public transportation when he decided to flee. But he stayed in the area for personal reasons (to play softball, possibly to attend a concert) and fled without the car only because police had discovered the car and surrounded his motel room, rendering his flight in the vehicle impossible. He presented no evidence he took the car only temporarily or that he intended to return it when he was finished using it.

Only by unreasonably rejecting the evidence could a jury have reached the conclusion that defendant intended to return the car to its owner. Accordingly, there being no question that all the elements of Vehicle Code section 10851 were shown, and there being only insubstantial evidence he intended to deprive Melitta Greig of her car only temporarily, we conclude the trial court did not err under state law in failing to instruct sua sponte on joyriding as a lesser included offense.

For the same reasons, we also reject defendant's claim that the court's failure to instruct on joyriding violated his federal due process rights. "Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction." (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1145; see *Hopper v. Evans* (1982) 456 U.S. 605, 611 [72 L.Ed.2d 367, 102 S.Ct. 2049].) Here, the evidence did not warrant the instruction.

### 4. *Flight Instruction*

After the close of evidence at the guilt phase, the trial court instructed the jury with CALJIC No. 2.52, which informs the jury it may consider defendant's flight after the crime as circumstantial evidence of his guilt or innocence. Defendant contends the court erred by giving this instruction, arguing that the inference his flight may have raised, namely, that he suffered a guilty conscience and thus probably killed the victims, was irrelevant because he

admitted having killed them. Although he contested his mental state at the time of the killings, his flight after the murders, he argued, was irrelevant to the question of whether he premeditated and deliberated his crimes. We reject the claim.

■ At the outset, respondent contends defendant is precluded from raising this issue because he invited the error. We disagree. When the trial court discussed with the attorneys the instructions it planned to deliver at the end of the guilt phase, it mentioned CALJIC No. 2.52 in a list of other instructions and then stated: "Pursuant to stipulation *or at least the lack of opposition* I assume both attorneys are jointly requesting I give these instructions." (Italics added.) Defense counsel replied: "That's correct." Thus, counsel may have only acquiesced in the instruction. The invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction. (*People v. Boyette, supra,* 29 Cal.4th at p. 438; cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [17 Cal.Rptr.3d 710, 96 P.3d 30] [counsel's affirmative action, as opposed to mere acquiescence, implied a tactical purpose].) Because the record here shows no tactical reason, we reject the People's reliance on the invited error doctrine.

Nevertheless, we find the issue is meritless. Although defendant's theory of the case was that he was guilty of only second degree murder, he pleaded not guilty to the charges, thereby putting in issue "all of the elements of the offenses." (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Even if he conceded at trial his guilt of some form of criminal homicide, "the prosecution is still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent." (*Ibid.*) We have previously rejected the notion that the flight instruction is improper when an accused concedes the issue of identity and merely contests his mental state at the time of the crime. (*People v. Smithey* (1999) 20 Cal.4th 936, 983 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Moreover, even were we to assume the court erred by giving the instruction, the error was harmless under any standard. Even had the jury not been instructed with CALJIC No 2.52, it would still have been aware of defendant's flight, both from the crime scene in Melitta's stolen car and from the general area once police surrounded his motel room.

### 5. *Alleged Failure to Instruct on Willfulness*

At defendant's request or with his acquiescence, the trial court instructed the jury with CALJIC No. 3.31.5, informing it that "[i]n each of the crimes charged in counts 1 and 2 of the information, namely, first degree murder and first degree murder, there must exist a certain mental state in the mind of the

perpetrator. Unless such mental state exists, the crime to which it relates is not committed. In the crime of first degree murder, the necessary mental state is express malice and premeditation and deliberation. The . . . *mental states required are included in the definition of the crimes charged.*" (Italics added.) Also at defendant's request or with his acquiescence, the trial court instructed the jury with CALJIC No. 8.20, which states in pertinent part: "All murder which is perpetrated by any kind of *willful,* deliberate and premeditated killing with express malice aforethought is murder of the first degree." (Italics added.)

 Defendant now claims CALJIC No. 3.31.5 was fatally flawed because, although it defined the mental state for first degree murder to include premeditation and deliberation, it failed to include the critical element of willfulness in that definition.[4] We disagree the instructions were flawed; the jury was instructed that first degree murder requires express malice, and the concept of express malice includes that of willfulness. A willful murder is an intentional murder, and malice is express when there is an intent to unlawfully kill a human being. (*People v. Young* (1987) 189 Cal.App.3d 891, 910 [234 Cal.Rptr. 819]; see CALJIC Nos. 8.20 ["[T]he word 'willful,' as used in this instruction, means intentional"] and 8.11 ["Malice is express when there is manifested an intention unlawfully to kill a human being"].)

 Defendant relies on cases that state that "the mental state comprising malice is independent of that encompassed within the concepts of willfulness, deliberation, and premeditation." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103 [13 Cal.Rptr.2d 864, 840 P.2d 969]; see also *People v. Croy* (1985) 41 Cal.3d 1, 18 [221 Cal.Rptr. 592, 710 P.2d 392].) Although malice may include concepts that are not included in willfulness, willfulness does not include any concept that is not contained in express malice. An intent to kill is the " 'functional equivalent' " of *express* malice. (*People v. Catlin, supra,* 26 Cal.4th at p. 151.) The instruction defendant challenges here, that murder requires "express malice, deliberation, and premeditation," thus included the element of willfulness because express malice was defined for the jury as requiring an intent to kill.

To the extent defendant contends the interplay between CALJIC Nos. 3.31.5 and 8.20 created a conflict that could have confused the jury, his failure to seek "amplification or explanation" of the instruction precludes relief on appeal. (*People v. Lewis* (2001) 26 Cal.4th 334, 380 [110

---

[4] As with the claim regarding the flight instruction, *ante,* respondent contends appellate review of this issue is barred by the invited error doctrine. We reject that contention for the same reasons, i.e., defense counsel merely acquiesced to the instruction, and the record does not show whether counsel's decision was a tactical one.

Cal.Rptr.2d 272, 28 P.3d 34].) There being no error, we also reject defendant's claim that the alleged instructional error violated his due process rights under the United States Constitution.

### 6. *Failure to Give Requested Instructions on Premeditation*

 Defendant requested four special instructions to highlight the defense theory that the killings of Melitta and Rose Greig were not premeditated or deliberated. The trial court gave one of the instructions but declined to give the other three. Defendant contends the trial court's refusal to give these three special instructions denied him his right to a "full and fair opportunity to present a defense," which we take to mean defendant is invoking his federal constitutional right to present a defense (see *People v. Maury* (2003) 30 Cal.4th 342, 413 [133 Cal.Rptr.2d 561, 68 P.3d 1]). He also suggests the court's refusal to give the three instructions violated state law. "We have suggested that 'in appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged." (*People v. Bolden* (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931].) We turn to examine whether any of defendant's three proffered instructions was improperly rejected, mindful of the general rule that a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224]), or if it is not supported by substantial evidence (*People v. Bolden, supra,* at p. 558).

Defendant first argues the trial court improperly rejected his proffered instruction providing an alternative definition of premeditation and deliberation.[5] Although the language for the proposed instruction was derived from *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], our seminal case addressing proof of premeditation and deliberation, the trial court correctly declined to give the instruction. As explained in *People v.*

---

[5] Defendant's proposed instruction read as follows: "Before you may find that the killing in this case was deliberate and premeditated you must find evidence of planning activity, motive to kill, and a calculated killing; or extremely strong evidence of planning activity; or evidence of motive to kill, in conjunction with either planning activity or a calculated killing.

"Planning activity refers to facts about how and what the defendant did before the actual killing which show that he was engaged in activity directed toward and intended to result in the killing.

"Motive to kill refers to a reason for the killing which may be inferred from defendant's prior relationship and/or conduct with the victim.

"A calculated killing as opposed to an explosion of violence, may be inferred from facts about the nature of the killing and its commission in a particular and exacting manner such that the defendant must have intentionally killed according to a preconceived design to take the victim's life in a particular way for a reason."

*Steele, supra,* 27 Cal.4th at page 1254, where we addressed the identical issue: " 'By its very terms, *People v. Anderson, supra,* 70 Cal.2d 15, guides appellate courts in conducting sufficiency-of-evidence review of findings by juries of premeditation and deliberation. (See *id.* at pp. 24–34.) It does not even purport to constrain juries in making such findings.' " Defendant admits we have often held similar instructions improper (see *People v. Lucero* (1988) 44 Cal.3d 1006, 1021 [245 Cal.Rptr. 185, 750 P.2d 1342]) but argues those cases are inapposite because, unlike in those cases, the instruction here was relevant to his theory of the case. Even assuming that is so, his argument does not address the core reasoning of the authorities that previously have rejected this argument, to wit, that to the extent the instruction purports to limit the jury's consideration of the evidence of premeditation and deliberation, it is an incorrect statement of law. (*People v. Gurule, supra,* 28 Cal.4th at p. 659.)

Defendant next argues the trial court erred by refusing to instruct the jury that "[t]he brutality of a killing cannot by itself establish that the killer acted with deliberation and premeditation." The trial court declined to give this instruction, saying merely that "I don't think we need it," thereby suggesting the instruction was duplicative. Although the language for this proposed instruction also comes from *People v. Anderson, supra,* 70 Cal.2d at page 24, and is a correct statement of law (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238 [278 Cal.Rptr. 640, 805 P.2d 899] ["brutality alone cannot show premeditation; a brutal killing is as consistent with a killing in the heat of passion as with a premeditated killing"]), the court did not err by declining the instruction because it was incorporated in CALJIC No. 8.20. "The brutality of a killing . . . [is] not enough to support a finding that [the killer] acted with premeditation and deliberation; the killing produced by an 'explosion of violence' is more consistent with a lesser grade of homicide than premeditated murder. [Citation.] *In a general way, the foregoing are the concepts incorporated in the pattern instruction on premeditated murder published as CALJIC No. 8.20."* (*People v. Smith* (1973) 33 Cal.App.3d 51, 64 [108 Cal.Rptr. 698], italics added.) As such, it was duplicative of the instructions the court gave the jury. (*People v. Gurule, supra,* 28 Cal.4th at p. 659.)

Defendant finally argues the trial court erred by refusing to instruct the jury that "[d]eliberate and premeditated murder requires substantially more reflection, that is, more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill." The trial court declined to give this instruction, explaining that the standard CALJIC instructions satisfactorily addressed the issue. We agree the proposed instruction was duplicative of CALJIC No. 8.20. (*People v. Gurule, supra,* 28

Cal.4th at p. 659.) For example, pursuant to CALJIC No. 8.20, the jury was instructed that "[t]he law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under different circumstances—or varying circumstances. The true test is not the duration of time, but, rather, the extent of the reflection." In addition, to the extent the proposed instruction required "*substantially* more reflection" (italics added) than was necessary to find an intent to kill, it was also objectionable as argumentative. (*People v. Carter* (2003) 30 Cal.4th 1166, 1225 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

In any event, even were we to assume the court erred in failing to give one or all of these instructions, any such error would be harmless because the jury was adequately instructed on defendant's theory that the murders occurred in an explosion of unplanned and unpremeditated violence. For example, pursuant to CALJIC No. 8.20, the jury was instructed in pertinent part: "The word deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word premeditated means considered beforehand. If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection, *and not under a sudden heat of passion or other condition precluding the idea of deliberation,* it is murder of the first degree." (Italics added.) The same instruction continued: "A cold, calculated judgment and decision may be arrived at in a short period of time, *but a mere unconsidered and rash impulse, even though it include[s] an intent [to] kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.*" (Italics added.) Moreover, by sustaining the lying-in-wait special-circumstance allegation, the jury necessarily found defendant did not kill Rose Greig in an explosion of unconsidered violence. In sum, the proposed instructions were properly refused, and any error in failing to give them was harmless, both because it is not reasonably probable defendant would have achieved a better result absent the alleged error (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) and because any error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]).

## II. PENALTY PHASE

### A. *Facts*

The prosecution called no witnesses at the penalty phase, but introduced into evidence several photographs of the victims that had not been admitted

previously. The parties stipulated to the circumstances surrounding the taking of these photographs.

Defendant called several witnesses to present mitigating evidence. His mother, Jeanette Ruggiero, testified defendant was never violent as a child and never had any problems in school or with the police. In fact, one time as a child another student hit him in class, but defendant did not fight back. He remained in contact with his family and would return to the Fresno area for family reunions. He has two younger brothers. Randy Moon, one of defendant's brothers, testified that defendant was a caring person, had been a popular student growing up, and was never involved in any violent behavior.

Cynthia Turner testified that from September 1989 until April 1990, she was a coworker with defendant at the Outdoor Science School for Orange County. They worked together in an outdoor setting under the supervision of credentialed teachers with fifth, sixth, and seventh graders. Defendant worked very well with the children; in fact, they idolized him. She had a hard time believing he committed the crimes of which he had been convicted. She was not aware of any violence or psychological abnormality associated with defendant.

Claudia Santillan had been friends with defendant for almost three years. They began working in a furniture store together and then were both hired to work at the Outdoor Science School for Orange County. As did Turner, Santillan confirmed that defendant worked well with the children in the program and was well liked by them. She never felt threatened by him and was shocked when she heard of his crimes. She provided several letters written to defendant from children in the Outdoor Science School that documented their respect and affection for him.

Norella Barros had known defendant about three years and considered him her best friend. They worked together at a furniture store and then at a clothing store. He was very kind and supportive of her attempts to finish school. She never found him violent and did not believe in her heart that he was guilty.

Ronnie Trujillo had known defendant more than three years and played on the same softball team. Like all the players, defendant would sometimes argue with the umpire, but he was never violent. Once, when one of the players charged the umpire, defendant intervened to prevent any violence. He was shocked when he heard about the crimes.

## B. *Discussion*

### 1. *Admission of Photographs*

At the guilt phase of trial, the prosecutor moved to introduce several photographs of the victims. Most of the photographs were taken in connection with their autopsies; a few were crime scene photographs. The prosecutor argued the photographs were relevant to the issues of malice and intent to kill, and to contradict defendant's version of the killings. The trial court deferred the matter until later in the trial, but noted the photographs were "gory," "stunning," and "shocking." The trial court subsequently explained the photographs were relevant to the manner of death, but "there is so much prejudice to the defendant by the pictures that I am going to keep them out pursuant to [Evidence Code section] 352. [¶] In other words I have weighed the evidence and the prejudice does outweigh the probative value which they do have."

Following the guilt phase verdicts, the prosecutor renewed his motion to admit the photographs, arguing they were relevant to the degree of callousness, violence, and cruelty involved in defendant's crimes. Defense counsel reminded the trial court that it had characterized the photographs as "gory" and "stunning," and argued both that the photographs were not relevant to any disputed issue at the penalty phase and that their prejudice to defendant outweighed any probative value. The court distinguished the guilt phase from the penalty phase, noted that the photographs were "probative as to an aggravating circumstance, at least as to the second murder," and overruled the motion to exclude them under Evidence Code section 352.

Defendant contends that by admitting these photographs, the trial court violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and his rights under article I, sections 7, 15, 17, and 24 of the California Constitution. "The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion. (*People v. Scheid* (1997) 16 Cal.4th 1, 13–14 [65 Cal.Rptr.2d 348, 939 P.2d 748].) 'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 713 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

In support of his claim that the trial court abused its discretion, defendant emphasizes the fact the trial court had excluded the same photographs at the guilt phase. But the trial court's exclusion of the photographs at the guilt phase and admission of them at the penalty phase is consistent with

our cases, which draw a distinction between photographic evidence at the guilt and penalty phases of a capital trial. "[T]he trial court's discretion [at the penalty phase] to exclude circumstances-of-the-crime evidence as unduly prejudicial is more circumscribed than at the guilt phase. During the guilt phase, there is a legitimate concern that crime scene photographs . . . can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes. *Such concerns are greatly diminished at the penalty phase* because the defendant has been found guilty of the charged crimes, and the jury's discretion is focused on the circumstances of those crimes solely to determine the defendant's sentence. Indeed, the sentencer is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light." (*People v. Box* (2000) 23 Cal.4th 1153, 1201 [99 Cal.Rptr.2d 69, 5 P.3d 130], first italics added.)

We have examined the photographs in question and indeed find them bloody and graphic. Nevertheless, the jury had already found defendant guilty of the two murders, so there was no risk the jurors would react so emotionally to the pictures that they might convict an innocent man. Guilt having been established, the jury was left with the decision whether defendant deserved to live or die for his crimes. The photographs demonstrated the real life consequences of defendant's crimes and pointedly made clear the circumstances of the offenses, the only aggravating factor on which the People relied. "As we have previously noted, ' "murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant." ' " (*People v. Roldan, supra,* 35 Cal.4th at p. 713.)

Because we cannot say the trial court exercised its broad discretion in admitting or excluding such evidence "in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice" (*People v. Lawley* (2002) 27 Cal.4th 102, 158 [115 Cal.Rptr.2d 614, 38 P.3d 461] [addressing motion for jury view]), we reject the claim of error. Assuming without deciding that defendant preserved a claim of constitutional error despite his failure to make timely and specific objections on such grounds (*People v. Yeoman* (2003) 31 Cal.4th 93, 117–118, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166]), we reject that claim for the same reasons.

## 2. *Instruction Not to Consider Guilt Phase Instructions*

Before the commencement of the penalty phase, the parties discussed what the jurors should do with the written copies of the guilt phase jury instructions still in their possession. Without contradiction from defense counsel, the prosecutor stated: "I believe *both counsel are requesting* that [the copies of the guilt phase instructions] be collected if they have them here today."

(Italics added.) Defense counsel added that the court should also instruct the jurors not to refer to the guilt phase instructions when they returned to their homes. The court agreed. Back in open court, the trial court addressed the jury:

"THE COURT: . . . Ladies and gentlemen, the attorneys asked me to remind you that if you still have the instructions that were given to you in the guilt phase, *don't refer to them any further in this trial because you are going to have a new set of instructions probably later today and there's a different focus.*

"The original packet was used and the rules were relative to the guilt phase. Now we're in what we call the penalty phase so we're going to have a separate packet, and just so you are not confused, *you are not to refer to the instructions previously given to you any further.* Do you understand that?

"So if you have them with you, that's fine, but don't bring them into the jury room. If they are in the jury room, give them to the bailiff later so we have them over here and you can take them home after today. If you have them at home, don't look at them until the trial is over because we have a new packet for you. We want you to just stay with the law on the penalty phase.

"Do you all understand that? It's just so we don't get confused with the instructions. It's very important that we do it the right way, otherwise we do it again, later on." (Italics added.)

When the trial court instructed the jury for the penalty phase, however, it failed to instruct the jury generally regarding the consideration and evaluation of evidence. Thus, for example, unlike for the guilt phase, the jury was not specifically instructed at the penalty phase how to consider statements by attorneys, testimony for which an objection was sustained, and insinuations couched in questions (CALJIC No. 1.02); nor was it instructed regarding the prohibition on independent investigation (CALJIC No. 1.03), the definitions of "evidence," "direct evidence," and "circumstantial evidence" (CALJIC No. 2.00), how to consider inconsistent statements by witnesses (CALJIC No. 2.13), assessing the believability of a witness (CALJIC No. 2.20), the weighing of conflicting testimony (CALJIC No. 2.22), or the sufficiency of the testimony of a single witness (CALJIC No. 2.27). Defendant contends the court's failure to instruct generally on these matters violated his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, as well as his rights under article I, sections 7, 15, and 17 of the California Constitution.

At the threshold, respondent contends defendant invited the error because defense counsel joined in the prosecutor's request to retrieve the copies of the

guilt phase instructions from the jurors and even asked the trial court to follow up on that suggestion by directing the jurors not to consider the guilt phase instructions when they went home. Counsel did not, however, request or invite the trial court to omit from the penalty instructions those instructions he now claims were important. Counsel merely joined in the prosecutor's request to retrieve the written copies of the guilt phase instructions from the jury. Under the circumstances, counsel may well have believed that the court would—consistent with CALJIC No. 8.84.1[6]—later reinstruct the jury with those guilt phase instructions that retained their applicability in the penalty phase. Because counsel did not specifically ask the trial court to refrain from reinstructing the jury with the applicable guilt phase instructions, counsel's actions did not absolve the trial court of its obligation under the law to instruct the jury on the "general principles of law that [were] closely and openly connected to the facts and that [were] necessary for the jury's understanding of the case." (*People v. Carter, supra,* 30 Cal.4th at p. 1219.) Accordingly, we reject respondent's contention that the invited error doctrine precludes our consideration of the issue on appeal.

Turning to the merits, we agree with defendant that the trial court erred. Instructing the jury "not to refer to the instructions previously given to you any further," is consistent with CALJIC No. 8.84.1 (see fn. 6, *ante*) and "may be [an] effective, perhaps even preferable" practice (*People v. Steele, supra,* 27 Cal.4th at p. 1256), but if a trial court so instructs a capital jury, it must later provide it with those instructions applicable to the penalty phase.[7]

The court's omission of the applicable instructions, though error, does not necessarily require reversal. *People v. Carter, supra,* 30 Cal.4th 1166, is illustrative. In that case, the jury—as here—was instructed at the penalty phase to disregard the guilt phase instructions. The defendant contended the court's subsequent failure to reinstruct the jury with CALJIC No. 2.80, which informs the jury that it is not bound by expert testimony but may accord it any weight it deems proper, was error. We agreed but found the error harmless. Although the defendant argued the instruction's absence may have

---

[6] CALJIC No. 8.84.1, though fairly new, was available for defendant's trial (*People v. Steele, supra,* 27 Cal.4th at p. 1255) and provides in pertinent part: "You will now be instructed as to all of the law that applies to the penalty phase of this trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial." The Use Note following this instruction explains the instruction "should be followed by all appropriate instructions beginning with CALJIC 1.01, concluding with CALJIC 8.88." (Use Note to CALJIC No. 8.84.1 (7th ed. 2005) p. 445.)

[7] We again strongly urge trial courts to ensure penalty phase juries are properly instructed on evidentiary matters. "The cost in time of providing such instructions is minimal, and the potential for prejudice in their absence surely justifies doing so." (*People v. Carter, supra,* 30 Cal.4th at p. 1222.)

led the jury to disregard entirely his expert witness's testimony, we noted the respondent suggested it was just as likely the jury accorded undue weight to the expert's views, thereby favoring the defendant. "Whether or not the suggestion is valid, we see no reason to assume, as [the] defendant apparently does, that in the absence of the instruction the jury must have 'totally disregarded' [the expert's] testimony. Notwithstanding defendant's complaint that the jury was left 'in the complete dark' as to how to evaluate [the expert's] testimony and that of other witnesses, the jury expressed no confusion or uncertainty in this regard and never requested clarification." (*People v. Carter, supra*, at p. 1221.)

We similarly rejected the notion that the failure to reinstruct with the standard circumstantial evidence instruction (CALJIC No. 2.00) prejudiced the defendant. Although circumstantial evidence had been presented at his penalty phase, we explained that the defendant "fails to suggest how the jury, lacking CALJIC Nos. 2.00 and 3.01, might have misunderstood or misused that evidence. Similarly, [the] defendant demonstrates that various other evidentiary instructions were applicable on the facts of [his] case, but he does no more than speculate that their absence somehow prejudiced him. Under the applicable test of a claim that the failure to instruct a sentencing jury deprived a defendant of rights under the Eighth and Fourteenth Amendments to the federal Constitution, [the] defendant fails to demonstrate that the instructions given in his case, to a reasonable likelihood, precluded the sentencing jury from considering any constitutionally relevant mitigating evidence." (*People v. Carter, supra*, 30 Cal.4th at p. 1221.)

In short, we examined in *People v. Carter, supra*, 30 Cal.4th 1166, the nature of the evidence presented to determine whether it was likely the omitted instructions affected the jury's evaluation of the evidence. We apply the same analysis here and find the nature of the evidence presented at defendant's penalty phase particularly significant. The prosecution called no witnesses and relied principally on the circumstances of the crime as shown by the guilt phase evidence. The only new evidence the People presented consisted of photographs of the victims. In mitigation, defendant called his mother and brother to the stand, as well as four friends: Cynthia Turner, Claudia Santillan, Norella Barros, and Ronnie Trujillo. None of these six witnesses testified at length, and none was vigorously cross-examined by the prosecutor. The mitigation witnesses attested generally to defendant's good nature and lack of prior acts of violence. Defendant called no expert witness to present his social history; instead, his mother and brother provided a brief glimpse into the nature of his childhood. No forensic experts or mental health professionals took the stand for either side. Defendant's witnesses were not impeached with prior inconsistent statements, and all spoke from personal knowledge of defendant. There were no accomplices to the crime, neither side presented any circumstantial evidence, and no evidence was admitted for

a limited purpose. In short, the penalty phase evidence was entirely straight-forward, and the trial court's failure to reinstruct the jury with any applicable guilt phase instructions was harmless under any standard.

Defendant contends the trial court's instructions, such as "there's a different focus" at the penalty phase and to "stay with the law on the penalty phase," may have led jurors to assume that "the same framework for considering evidence might not apply at the penalty phase as applied at the guilt phase" and that they were "free to make a standardless assessment of the evidence presented at both phases of the trial when determining [his] sentence." This contention is pure speculation; defendant identifies no specific harm that could plausibly have resulted from a missing guilt phase instruction. Certainly nothing in closing argument by either side suggested the jurors were free to make a "standardless assessment of the evidence." Significantly, the jury was instructed to "consider all the evidence which has been received during any part of the trial" and to "consider, take into account and be guided by" the applicable factors, including "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (See § 190.3, factor (k).) In addition, the jury was specifically instructed it could consider mercy and sympathy for defendant.

On this record, we conclude the trial court's failure to reinstruct the jury with applicable guilt phase instructions, though error, was harmless because defendant "fails to demonstrate that the instructions given in his case, to a reasonable likelihood, precluded the sentencing jury from considering any constitutionally relevant mitigating evidence." (*People v. Carter, supra,* 30 Cal.4th at p. 1221.)

### 3. *Refusal to Instruct the Jury Not to Rely Solely on the Facts of the Offense*

The trial court refused defendant's two proposed special jury instructions that would have prohibited the jury from what he characterizes as improper double-counting of guilt phase facts. His first proposed instruction stated: "In deciding whether you should sentence the defendant to life imprisonment without the possibility of parole, or to death, you cannot consider as an aggravating factor any fact which was used by you in finding him guilty of murder in the first degree unless that fact establishes something in addition to an element of the crime of murder in the first degree." His second proposed instruction was similar, but addressed facts in support of the special circumstance findings.

 Defendant contends the trial court's refusal to give his proposed instructions violated his constitutional rights to a reliable sentencing determination and a fair trial in violation of the Eighth and Fourteenth Amendments to the United States Constitution. We rejected this exact claim in *People v. Earp* (1999) 20 Cal.4th 826 [85 Cal.Rptr.2d 857, 978 P.2d 15]. As we explained in that case, section 190.3, factor (a) expressly permits the jury to consider at the penalty phase the circumstances of the crime and the existence of any special circumstances it finds true. Nor need the trial court give a clarifying interpretation of factor (a) to inform the jury it cannot base its penalty determination on facts common to all murders. (*People v. Earp, supra*, at p. 900.) " 'The argument to the contrary,' " we stated, " 'reveals "a 'basic misunderstanding' of the statutory scheme since, in order to perform its moral evaluation of whether death was the appropriate penalty, the facts of the murder 'cannot comprehensively be withdrawn from the jury's consideration . . . .' " [Citation.]' " (*Id.* at pp. 900–901.) Nor is the penalty phase jury constitutionally required to disregard those aspects of the crime common to all first degree premeditated murders. "The same is true with regard to facts establishing the special circumstances." (*Id.* at p. 901.)

Defendant argues we should reconsider the issue because our resolution in *People v. Earp* was based on "an erroneous premise: the propriety of the double-counting that the proposed instructions sought to eradicate." We disagree and instead find it is defendant who proceeds from a questionable premise. He suggests that because our state's death penalty law provides what he characterizes as "minimal guidance" and "unbridled discretion" to jurors at the penalty phase, "double-counting must be curtailed if the California capital sentencing scheme is to pass constitutional muster." He argues that "[g]iven the minimal narrowing accomplished by the special circumstances and the open-ended nature of the aggravating factors in Penal Code section 190.3, the jury's discretion must be channeled at the penalty phase so that there can be a meaningful distinction between persons sentenced to death and persons who are death-eligible, but not sentenced to death."

 Contrary to defendant's argument, we have explained that "the focus of the penalty selection phase of a capital trial is more normative and less factual than the guilt phase. The penalty jury's principal task is the moral endeavor of deciding whether the death sentence should be imposed on a defendant who has already been determined to be 'death eligible' as a result of the findings and verdict reached at the guilt phase. In such a penalty selection undertaking, the Eighth Amendment's strictures are less rigid, more open-ended than the narrowing function of the capital sentencing scheme that has already occurred. . . . The gist of defendant's argument—that the trial court's penalty phase instructions failed to guide the jury in reaching a penalty decision, allowing it 'complete discretion'—is correct. But as this

court and the United States Supreme Court have pointed out, with respect to the process of selecting from among that class [of death eligible defendants] those defendants who will actually be sentenced to death, '[w]hat is important . . . is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.' (*Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 103 S.Ct. 2733].) It is not a mechanical finding of facts that resolves the penalty decision, ' " 'but . . . the jury's moral assessment of those facts as they reflect on whether defendant should be put to death . . . .' " ' (*People* v. *Brown* (1985) 40 Cal.3d 512, 540 [230 Cal.Rptr. 834, 726 P.2d 516].)" (*People* v. *Musselwhite* (1998) 17 Cal.4th 1216, 1267–1268 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Thus, once a defendant is rendered death eligible by the jury having found true at least one special circumstance allegation (*People* v. *Boyette*, *supra*, 29 Cal.4th at pp. 439–440), " 'the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing "scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." [Citation.]' (*California* v. *Ramos* (1983) 463 U.S. 992, 1009, fn. 22 [77 L.Ed.2d 1171, 103 S.Ct. 3446].)" (*People* v. *Bolin*, *supra*, 18 Cal.4th at p. 342.)

In short, we find no reason to revisit our decision in *People* v. *Earp*, *supra*, 20 Cal.4th 826, and conclude the trial court correctly refused defendant's two proposed special instructions as incorrect statements of law. (*People* v. *Gurule*, *supra*, 28 Cal.4th at p. 659 [instruction may be refused if incorrect statement of law].)

### 4. *CALJIC No. 8.85*

The trial court instructed the jury with CALJIC No. 8.85, the standard pattern instruction describing the sentencing factors for the penalty phase. Defendant contends the instruction is "constitutionally flawed" but concedes we have rejected identical arguments in the past. He urges us to reconsider our view that the instruction is constitutional, arguing we have not adequately addressed his arguments previously. We disagree and decline to revisit our prior rejections of these arguments. Thus, we hold CALJIC No. 8.85 is not unconstitutional:

(a) For failing to label which of the sentencing factors are aggravating and which are mitigating (*People* v. *Williams* (1997) 16 Cal.4th 153, 268–269 [66 Cal.Rptr.2d 123, 940 P.2d 710]);

(b) For prefacing some sentencing factors with the phrase "whether or not" and failing to inform the jury that some factors can be mitigating only (*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]);

(c) For failing to inform the jury that the absence of a mitigating factor cannot be considered an aggravating factor (*People v. Weaver, supra,* 26 Cal.4th at p. 993; see *People v. Davenport* (1985) 41 Cal.3d 247, 288–290 [221 Cal.Rptr. 794, 710 P.2d 861]);

(d) For failing to delete inapplicable factors (*People v. Jones* (2003) 30 Cal.4th 1084, 1129 [135 Cal.Rptr.2d 370, 70 P.3d 359]);

(e) For failing to state that the list of aggravating factors is exclusive and that nonstatutory aggravating factors cannot be considered (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]; see *People v. Boyd* (1985) 38 Cal.3d 762, 772–776 [215 Cal.Rptr. 1, 700 P.2d 782]); or

(f) For using "restrictive adjectives" such as "extreme" and "substantial" (*People v. Weaver, supra,* 26 Cal.4th at p. 993).

In short, we reject the argument that the aggravating and mitigating factors, as set forth in section 190.3 and CALJIC No. 8.85, are unconstitutionally vague or arbitrary or render the sentencing process constitutionally unreliable under the Eighth and Fourteenth Amendments to the United States Constitution.

### 5. *CALJIC No. 8.88*

The trial court instructed the jury with CALJIC No. 8.88, the standard pattern instruction for concluding the penalty phase. Defendant contends the instruction violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding sections of the California Constitution. He concedes we have rejected identical arguments in the past but urges us to reconsider our view that the instruction is constitutional. Finding no persuasive reason to so do, we decline to revisit the reasoning or the holdings of these prior cases and hold CALJIC No. 8.88:

(a) Is not unconstitutional for failing to inform the jury that if it finds the circumstances in mitigation outweigh those in aggravation, it is required to impose a sentence of life without the possibility of parole (*People v. Dennis* (1998) 17 Cal.4th 468, 552 [71 Cal.Rptr.2d 680, 950 P.2d 1035]);

(b) Is not unconstitutional for failing to inform the jury that it has discretion to return a verdict of life even in the absence of mitigating circumstances (*People v. Ray* (1996) 13 Cal.4th 313, 355 [52 Cal.Rptr.2d 296, 914 P.2d 846]);

(c) Is not unconstitutionally vague for using the phase "so substantial" (*People v. Boyette, supra,* 29 Cal.4th at p. 465);

(d) Is not unconstitutional for failing to inform the jury that death must be the appropriate penalty, not just a warranted penalty (*People v. Boyette, supra,* 29 Cal.4th at p. 465);

(e) Is not unconstitutional for failing to inform the jury that it need not be unanimous before any juror can rely on a mitigating circumstance (*People v. Coddington, supra,* 23 Cal.4th at p. 641);

(f) Is not unconstitutional for failing to require juror unanimity on aggravating circumstances (*People v. Boyette, supra,* 29 Cal.4th at p. 465);

(g) Is not unconstitutional for failing to require written findings on aggravating circumstances (*People v. Nakahara* (2003) 30 Cal.4th 705, 721 [134 Cal.Rptr.2d 223, 68 P.3d 1190];

(h) Is not unconstitutional for failing to require written findings so as to facilitate "meaningful appellate review" (*People v. Williams, supra,* 16 Cal.4th at p. 276);

(i) Is not unconstitutional for failing to inform the jury there is a presumption of life (*People v. Maury, supra,* 30 Cal.4th at p. 440); and

(j) Is not unconstitutional for failing to define the meaning of life without the possibility of parole (*People v. Jones* (1998) 17 Cal.4th 279, 314 [70 Cal.Rptr.2d 793, 949 P.2d 890]).

Further, because "[t]he absence of a burden of proof, except for proof of prior criminal acts under section 190.3, factor (b), does not render the California law unconstitutional" (*People v. Michaels* (2002) 28 Cal.4th 486, 541 [122 Cal.Rptr.2d 285, 49 P.3d 1032]), we reject defendant's multifarious arguments that CALJIC No. 8.88 is constitutionally flawed because it:

(k) Reduces the prosecution's burden of proof generally;

(l) Directs a verdict "as to certain issues in the defendant's case";

(m) Fails to assign a burden of proof;

(n) Fails to assign to the People a beyond-a-reasonable-doubt standard of proof;

(o) Fails to allocate to the People any burden of proof;

(p) Fails to inform the jury a defendant bears no burden to prove mitigating circumstances; and

(q) Fails to inform the jury neither side has any applicable burden of proof.

There being no legal requirement that the jury be informed of a burden of proof for the penalty phase, we also reject defendant's further claim that CALJIC No. 8.88's failure to inform the jury who bears the burden of proof constitutes a structural error requiring reversal of the penalty verdict without inquiry into prejudice. (See *Arizona v. Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246].)

Finally, we reject defendant's claim that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and its progeny (see *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]) undermine the constitutionality of California's capital sentencing scheme. (*People v. Griffin, supra,* 33 Cal.4th at p. 595.)

### 6. *The Lying-in-wait Special Circumstance, the Eighth Amendment, and the Death Penalty*

██ "To avoid the Eighth Amendment's proscription against cruel and unusual punishment, a death penalty law must provide a 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1], quoting *Furman v. Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 92 S.Ct. 2726].) Defendant contends the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) violates this basic precept because it fails to narrow sufficiently the class of persons eligible for death. We have rejected this contention many times, and defendant fails to persuade us that we should reconsider our previous decisions. (*People v. Nakahara, supra,* 30 Cal.4th at p. 721, and cases cited.) To the extent defendant contends our interpretation of the lying-in-wait doctrine to permit his conviction on the facts of this case raises grave constitutional questions, we reject that claim as well.

### 7. Motion for Modification of the Verdict

Following the jury's penalty phase verdict, defendant moved for modification pursuant to section 190.4, subdivision (e). After hearing argument from defense counsel, Mr. Lindars, and the prosecutor, Mr. Burns, the following discussion occurred:

"THE COURT: . . . In terms of the case, I think it was fairly presented to the people of the community. My own view is that it's a case of classic sociopathic behavior where Mr. Moon killed the young lady friend because of her feelings or charges that he had taken money, and then he killed this young person's mother so there would be no witness or implication of him in the first murder. And then he went about doing his ordinary affairs of life, playing softball and so forth because he apparently felt comfortable with his actions. Never was there any indication of remorse and I think that these factors were properly considered by the community.

"In any event, the community of 12 unanimously agreed that the disposition of the case would be by death and I am not going to deviate from their judgment and I will at this time—

"MR. BURNS: Your honor, I believe the court—

"THE COURT:—will deny a modification of verdict. So let me indicate the defendant's motion for new trial and modification of verdict [are denied] and [the jury's] findings in imposing the death penalty have been upheld by the court. Your motions, Mr. Lindars, are denied.

"There's no legal cause why I should not pronounce judgment at this time, Mr. Lindars, other than what you have said.

"MR. BURNS: Your honor, I believe the court has referred to it, but I believe it's required to be clear on the record, the court acknowledges it does have the power as the 13th juror to independently review all of the factual findings and in this case has done that and has agreed with the ultimate outcome.

"THE COURT: I am aware of my power, my authority, and I have weighed the entire matter and at this time I am ready to pronounce judgment, so I am pronouncing judgment at this time."

Defendant contends the trial court erred under section 190.4, subdivision (e) by denying his motion to modify his death sentence because the record fails to demonstrate the court independently reviewed the evidence to determine whether the jury's verdict was supported by law and evidence. He

compares his case favorably to *People v. Bonillas* (1989) 48 Cal.3d 757, 799–801 [257 Cal.Rptr. 895, 771 P.2d 844], and *People v. Burgener* (2003) 29 Cal.4th 833, 890–893 [129 Cal.Rptr.2d 747, 62 P.3d 1], in which we vacated the penalty verdicts and remanded to the trial courts for new hearings on the modification motions. We reject the comparison and find the trial court properly followed the law.

Section 190.4, subdivision (e) provides: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, *and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.*" (Italics added.)

 Under this standard, the trial judge " 'must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] . . .' '[T]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict.' " (*People v. Weaver, supra*, 26 Cal.4th at pp. 989–990.)

The record shows the court was aware of its authority and obligation to independently assess and evaluate the evidence.[8] When reminded by the prosecutor of the proper standard of review, the court affirmed it was aware of its authority and had weighed the evidence. The court's reference to what it considered a trivial reason for Melitta Greig's murder, defendant's attempt to cover up the first murder with a second one, and his apparent lack of remorse immediately after the crimes, all speak to the court's independent evaluation of the aggravated circumstances of the crimes. Although at one point the court remarked, "I am not going to deviate from [the jury's] judgment," that comment did not indicate the court felt powerless to disagree with the jury's verdict, but simply that the court, after weighing the evidence, agreed with the verdict.

---

[8] Accordingly, we also reject defendant's argument that the record is insufficient to conclude the court applied the proper standard in denying his section 190.4 motion. Although the court was fairly brief in its comments, there is nothing to indicate the court was unaware of the proper standard of review or applied an incorrect one.

*People v. Burgener, supra*, 29 Cal.4th 833, and *People v. Bonillas, supra*, 48 Cal.3d 757, are distinguishable because they pose quite different circumstances. In both those cases, the trial court's statements revealed it had applied an incorrect standard in denying the motion. (*People v. Burgener, supra*, at p. 891; *People v. Bonillas, supra*, at p. 801.) Here, in contrast, the court affirmed it had weighed the evidence and applied the independent review standard. We find no error.

### 8. *The Death Penalty Law Is Not Unconstitutional*

Citing the relatively small number of nations that employ the death penalty as a criminal sanction, and asserting that all nations of Western Europe have abolished it and that "our Founding Fathers looked to the nations of Western Europe for the 'law of nations' as models on which the laws of civilized nations were founded, and for the meaning of terms in the Constitution," defendant contends we should now find the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. (See *Roper v. Simmons* (2005) 543 U.S. 551, 568 [161 L.Ed.2d 1, 125 S.Ct. 1183, 1194] ["Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force"]; *Trop v. Dulles* (1958) 356 U.S. 86, 100–101 [2 L.Ed.2d 630, 78 S.Ct. 590] ["The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . .The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society"].)

 We have previously rejected the contention that capital punishment per se violates the Eighth Amendment's proscription against cruel and unusual punishment (*People v. Staten* (2000) 24 Cal.4th 434, 462 [101 Cal.Rptr.2d 213, 11 P.3d 968]), a conclusion consistent with that of the United States Supreme Court (see *People v. Rodriguez* (1986) 42 Cal.3d 730, 778 [230 Cal.Rptr. 667, 726 P.2d 113]). Whether a given punishment is cruel and unusual, however, is not a static concept. "The prohibition against 'cruel and unusual punishments,' like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." (*Roper v. Simmons, supra*, 543 U.S. at pp. 560–561 [125 S.Ct. at p. 1190]. )

For example, the United States Supreme Court has recently held that the execution of mentally retarded persons, though found at one time not to constitute cruel and unusual punishment (*Penry v. Lynaugh* (1989) 492 U.S.

302 [106 L.Ed.2d 256, 109 S.Ct. 2934]), is now prohibited by the Eighth Amendment to the United States Constitution (*Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242]). Similarly, the execution of persons who committed their crimes after their 15th birthday but before reaching their 18th birthday, once found not to fall within the proscription of the Eighth Amendment (*Stanford v. Kentucky* (1989) 492 U.S. 361 [106 L.Ed.2d 306, 109 S.Ct. 2969]), is now also considered cruel and unusual punishment in violation of the Eighth Amendment (*Roper v. Simmons, supra,* 543 U.S. 551 [125 S.Ct. 1183]).

 Neither of these two recent developments, however, convinces us that capital punishment per se is unconstitutional. Unlike with the execution of juveniles, no national consensus has emerged against the imposition of capital punishment in general. (See *Roper v. Simmons, supra,* 543 U.S. at p. 567 [125 S.Ct. at p. 1194].) Nor can we say capital punishment is used with diminishing frequency in those states in which it is legal. (*Ibid.*) Thirty-eight of our nation's states have some form of the death penalty, as does the federal government and the federal military; 12 states, as well as the District of Columbia, do not. (<http://www.deathpenaltyinfo.org/FactSheet.pdf> [as of Aug. 18, 2005].) Although defendant would have us consider that the nations of Western Europe no longer have capital punishment, those nations largely had already abolished it officially or in practice by the time the United States Supreme Court, in the mid-1970's, upheld capital punishment against an Eighth Amendment challenge. (See generally *The Death Penalty, Abolition in Europe* (Council of Europe 1999) p. 10.) We find no reason to question the United States Supreme Court's conclusion that capital punishment, per se, is not cruel and unusual punishment in contravention of the Eighth Amendment to the United States Constitution.

As we have on many occasions, we further reject defendant's claim that the California death penalty law violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution for failing to provide intercase proportionality review. (*People v. Gurule, supra,* 28 Cal.4th at p. 663; *People v. Lawley, supra,* 27 Cal.4th at p. 169.) The United States Supreme Court agrees. (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [intercase proportionality review not required by United States Constitution].) Defendant contends that "[t]he time has come for *Pulley v. Harris* to be reevaluated" but presents no compelling reasons to do so, relying only on his view that the law insufficiently guides the jury in the penalty determination, a view expressly rejected by the high court. (*Tuilaepa v. California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630].) We reject the further claim that the absence of intercase proportionality review violates defendant's right to equal protection of the law. (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

## III. CONCLUSION

We affirm the guilt and penalty phase judgments in their entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Moreno, J., concurred.