Filed 9/23/25  P. v. Grigoryan CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B334465 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA475142) |
| ARSEN GRIGORYAN et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge. Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant Arsen Grigoryan.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant Hrachya Azatyan.

Rob Bonta, Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

This criminal appeal arises from two shootings in October 2018. On October 13, Suren Tahmazyan was shot and killed outside the Ararat Restaurant in Glendale. On October 17, Rafik M.[1] was shot in the underground parking garage of an apartment complex in Studio City. Defendants Arsen Grigoryan, Hrachya Azatyan, and Vahagn Mkhitaryan were charged with both crimes. Mkhitaryan pled guilty to voluntary manslaughter and attempted murder, and he is not a party to this appeal. Grigoryan and Azatyan proceeded to trial and were convicted in May 2023.

Grigoryan appeals his conviction for the murder of Tahmazyan. Azatyan appeals his convictions for the murder of Tahmazyan and the attempted murder of Rafik. They argue the evidence was insufficient to support their convictions and to support the jury's special finding Tahmazyan was murdered by means of lying in wait. Because ample evidence supports the verdicts, we affirm.

**FACTUAL BACKGROUND**

**I.    Tahmazyan Is Murdered on October 13, 2018**

On October 13, 2018, Tahmazyan attended a friend's party at the Ararat Restaurant.[2] He arrived at the party around 7:15 p.m. or 7:20 p.m. Rafik arrived at the same restaurant just before 8:00 p.m. to meet some friends. Around 8:00 p.m., Tahmazyan walked to the parking lot with a friend, Hrant Khachikyan, to smoke. The restaurant is located on the corner of

---

[1]    We refer to the surviving victim by his first name and last initial. (See Cal. Rules of Court, rule 8.90(b)(4).)

[2]    In reciting this summary, "we 'view the facts in the light most favorable to the jury verdict.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

2

San Fernando Road and Ruberta Avenue in Glendale, and the parking lot is in front of the restaurant, bordering those streets. Tahmazyan stood with his back to the wall, facing the street, while Khachikyan stood with his back to the street. Several other party attendees were also in the parking lot.

Unbeknownst to Tahmazyan, while he was in the parking lot, two vehicles circled the restaurant. First, at 8:15 p.m., a white minivan, later identified as a Chrysler Pacifica model, with distinctive dark-colored rims and trim drove past the restaurant parking lot eastbound on San Fernando Road. There was a glow in its windshield consistent with a Lyft sign. It also appeared to have a paper license plate. The minivan proceeded to circle an adjacent block before parking at a 7-Eleven one block away from the restaurant. It stayed there until just after the murder occurred.

Second, about four minutes after the white minivan initially drove past the restaurant, at approximately 8:20 p.m., a black sports utility vehicle (SUV), later identified as a Hyundai Santa Fe model, slowly drove past it as well. The vehicle appeared to have a paper license plate. It slowly proceeded past the parking lot and Tahmazyan, circled the block via the alley behind the restaurant, and turned right onto Ruberta Avenue. It stopped at the corner of Ruberta and San Fernando, next to the restaurant parking lot, at 8:21:46 p.m.

Fourteen seconds later, at 8:22 p.m., the shooting occurred. Khachikyan heard footsteps approaching quickly from behind him. A man ran up, pointed a gun at Tahmazyan, and started shooting. The shooter was short, very skinny, wore dark clothing, and had unkempt facial hair. At trial, Khachikyan identified Azatyan as the shooter.

Khachikyan heard three gunshots. He was hit in the arm. Tahmazyan was fatally struck in the head three times. The autopsy determined he was shot from close range at a distance of about two feet.

After the shooting, Azatyan ran back toward San Fernando Road. Security footage showed a person entering the passenger side of the waiting black SUV. Another witness in the parking lot saw a man dressed in black getting into the rear passenger's seat of the black SUV, which drove away on San Fernando, turning right at the next street (Justin Avenue). Likewise, a passing motorist heard gunshots and saw a slim man, dressed in black, running with a gun in his hand. She saw him enter the back passenger seat of a medium-sized black SUV, which drove off. The motorist followed the SUV for the rest of the block and saw it turn right at Justin.

A few minutes later, the white minivan slowly drove past the crime scene, westbound on San Fernando.

At 8:23 p.m., one minute after the murder, security footage showed the black SUV driving eastbound on Glen Oaks Boulevard, away from the restaurant. Ninety seconds later, footage showed the white minivan heading in the same direction.

## II.     Rafik Is Shot on October 17, 2018

A few days later, Glendale police investigating Tahmazyan's murder learned Rafik was shot in Studio City. Rafik is an Armenian national who had been in Los Angeles for several weeks and was staying in an apartment complex on Bluffside Drive in Studio City. He planned to return to Armenia on October 17, and he arranged for two friends, Edik Egoyan and Sargis Akliyan, to drive him to the airport.

Egoyan and Akliyan arrived at Rafik's apartment complex to pick him up around 12:30 p.m. on October 17. Rafik opened the

driveway security gate and directed them to an underground parking garage. While they parked, Akliyan saw a white minivan drive past. Egoyan also saw the minivan, which ultimately parked next to his car.

Surveillance footage showed the white minivan had initially entered through one of the complex's security gates at 12:03 p.m., left at 12:06 p.m., drove by the complex at 12:08 p.m., and reentered through a gate at 12:11 p.m. At 12:29 p.m., the minivan parked next to Egoyan's car and the sliding door opened. The minivan's appearance in the footage was consistent with the minivan at the scene of Tahmazyan's murder.

When Egoyan parked the car, Akliyan alighted to greet Rafik and was approached by a man in a white hoodie sweatshirt. He heard a voice say "That's not him," and the man passed Akliyan, headed toward Rafik, and shot him. Rafik said "It hit me," and Akliyan heard the shooter say, "He did not die." Egoyan, who had ducked down inside the car to hide, also heard the shooter say something to that effect as he went into the minivan. The shooter was about 15 feet away from Egoyan, and Egoyan could see him through the rear window of his hatchback car. The shooter was very skinny, had a beard, and wore a cap. Police later showed Egoyan a photo lineup, and he identified Azatyan as the shooter.

Rafik was eventually transported to a hospital and treated for his injuries. Rafik believed he had been followed by the shooter, so Vahe Meliksetyan, who had been Rafik's driver during his stay in Los Angeles, took his car to a repair shop. A GPS (global positioning system) tracker was found affixed to the underside of the car. Police were called, and they recovered the tracker.

### III. The Police Uncover Evidence Linking Defendants to Both Crimes

In the course of their investigation, police developed and pursued the theory Tahmazyan's murder was a botched attempt to kill Rafik. Police ultimately uncovered abundant evidence supporting that theory and connecting defendants to both crimes.

#### A. The Black SUV

Before the crimes, Grigoryan had been seen driving a black Hyundai Santa Fe SUV with a "sport" trim package, consistent with the vehicle used in Tahmazyan's murder. In December 2017, a private investigator in an unrelated case filmed Grigoryan driving it.

Evidence also connected Azatyan to the black Santa Fe. The Santa Fe was impounded on January 14, 2019, as an abandoned vehicle less than a block from Azatyan's residence. Police recovered it on March 7, 2019, from a tow yard. Police had found keys to the Santa Fe in the Kia vehicle Azatyan was driving at the time of his February 13, 2019, arrest. They also found Azatyan's DNA on the right front roof handle of the Santa Fe.

#### B. The White Minivan

Grigoryan was also seen on multiple occasions, before and after the attempted murder of Rafik, with a white Chrysler Pacifica minivan. It had black wheels and rims, consistent with the vehicle involved in both crimes.

On October 15, 2018, surveillance footage from the SpyShop in Sherman Oaks showed Grigoryan purchasing a GPS tracker.[3] The footage also showed a white minivan driving away

---

[3] Grigoryan conceded at trial that he was the person depicted in the surveillance video buying the tracker.

from the shop. Other witnesses testified that on the same day, they saw Grigoryan, Mkhitaryan, and some other men at a coffee shop in Glendale.[4] They stood next to a white minivan without a license plate, and later, Mkhitaryan drove the group away in the minivan.

After the crimes, on November 1, 2018, police installed a GPS tracker on the white Pacifica Grigoryan was driving. They observed him driving the vehicle multiple times between November 1, 2018, and mid-January 2019. On January 13, 2019, the vehicle was towed to a repair shop in Van Nuys. Three people dropped it off, one of whom was Armen Azatyan, Defendant Azatyan's brother. Although the shop owner testified at trial that neither defendant had been with Armen Azatyan at his shop, he previously told police Grigoryan was one of the three men who dropped off the minivan, and the third man looked so similar to Armen Azatyan, he believed it was his brother.

When police seized the white Pacifica after Grigoryan's arrest, they found a piece of paper inside with the name Art LaLunc. They also found two water bottles in the front center console with Grigoryan's fingerprints.

The white Pacifica was leased and registered to Elesa Amirjanyan at an address on Darby Avenue in Reseda. Her sister told police Amirjanyan had died several years earlier in Armenia. The Kia Azatyan was driving at the time of his arrest was leased to himself and Amirjanyan at the same address.

---

[4] Cellphone evidence corroborated Grigoryan's location in the vicinity of the coffee shop.

### C. The Recovered GPS Tracker and Grigoryan's Alias

Police also connected the GPS tracker recovered from Meliksetyan's car to Grigoryan. They determined he had purchased it from the SpyShop on October 15, 2018. The shop owner helped Grigoryan connect the tracker to a phone number associated with Grigoryan, which allowed Grigoryan to follow the tracker's movements.

At the time he made the purchase, Grigoryan used the alias "Art LaLunc." Grigoryan had a California driver's license in that name, which he also gave to Fresno police when he was ticketed for tinted windows in November 2018.[5] As noted, that alias was written on a piece of paper recovered from the Pacifica.

### D. Cell Phone Evidence

The Federal Bureau of Investigation (FBI) assisted with the analysis of cellular data records for the GPS trackers[6] and a number of cell phones related to the investigation.[7]

---

[5] Art LaLunc testified that was his license, and he had not given Grigoryan permission to use it, his name, or his identity. He knew Grigoryan as "Levon," the brother of his coworker, Argam Yeghiazaryan. Yeghiazaryan's name was found on a AAA insurance card police recovered from the black Santa Fe.

[6] For simplicity, we refer to relevant phone numbers by their last four digits.

The SIM cards inside GPS trackers are assigned cell phone numbers. The number associated with the SIM card in the tracker recovered from Meliksetyan's car was -8609.

[7] Mkhitaryan was associated with two phones: -0003 and -3456.

On the night of Tahmazyan's murder, phones associated with all three defendants were in the Hollywood area and communicated with each other between 6:45 p.m. and 6:54 p.m. Likewise, around the time of the murder, they were all in the vicinity of the restaurant and were communicating with each other. Specifically, Grigoryan's phone connected with Azatyan's phone at 8:17 p.m., about four minutes before the murder, in the vicinity of the restaurant. Between 8:30 p.m. and 8:45 p.m., the phones contacted one another in the vicinity of Azatyan's residence.

Grigoryan's phone was also in the vicinity of the SpyShop around the time the GPS tracker was purchased on October 15. The tracker and Grigoryan's phone were then in the vicinity of the Glendale coffee shop between 11:30 a.m. and 11:57 a.m. that day, as well as later in the evening. By the following morning, October 16, the tracker was at the Meliksetyan residence and thereafter, traveled separately from Grigoryan's phone. During the rest of October 16, Grigoryan's and Mkhitaryan's phones were near the tracker. Mkhitaryan's phone followed the same path as the tracker toward the area of the Bluffside complex, and there was "quite a bit" of contact among the relevant phone numbers just after the tracker arrived at the Bluffside complex. When the tracker returned to the Bluffside complex just after 6:00 p.m., Grigoryan's and Mkhitaryan's phones were also in that

Azatyan was associated with three: -9723 (recovered from his bedroom and associated with the crime scenes); -7511 (found in the car he was driving when arrested); and -6077 (also found at his arrest).

Grigoryan was also associated with three: -8785 (not recovered); -7225 (not recovered); and -3427 (recovered from his pocket upon his arrest).

general area; an hour later, they were together in the vicinity of a friend's house on Rhodes Avenue in the Valley.

On October 17, the morning of the attempted murder of Rafik, phones associated with the trio were all in the vicinity of Rhodes Avenue between 10:30 and 11:00 a.m. Between 11:30 a.m. and 12:17 p.m., the phones were all in the vicinity of the Bluffside complex, sometimes calling each other.

## E.    The Wiretap Operation

On February 7, 2019, police received authorization to conduct a wiretap investigation into Grigoryan (-3427) and Azatyan (-7511). Because so much time had passed since the crimes were committed, police conducted a wiretap stimulation on February 12. They went to Azatyan's residence around 3:30 p.m., spoke with an older lady who lived there, told her they wanted to speak with Azatyan, and left Detective Krivak's business card. The card stated Detective Krivak's name, "Glendale Police Department," and "Robbery-Homicide." On February 13, police went to the home of Azatyan's child's mother, told her they were investigating the murder at the restaurant, showed her some composite sketches, and asked her about Azatyan.

Those visits precipitated a flurry of calls by Azatyan and Grigoryan, including to each other and to Mkhitaryan, which police were able to intercept. Even though police had implicated only Azatyan during the stimulation, the wiretapped conversations discussed Grigoryan's plans for both Azatyan and himself to quickly flee to Mexico.

## IV.  Azatyan and Grigoryan Attempt to Flee and Are Arrested

All three defendants were arrested on February 13, 2019. Grigoryan was arrested after he left his home in Fresno with two

suitcases around 11:50 p.m., driving away at high speed. He tried to evade police by driving onto a sidewalk, but police were ultimately able to apprehend him when he crashed into a police vehicle. He was carrying credit cards in the names of several individuals, including Art LaLunc and Elesa Amirjanyan, and he had a California driver's license in the name of yet another individual. Grigoryan was carrying $1,840 in cash, two suitcases, and had a Lyft sign on the floorboard.

Azatyan was arrested in south Orange County while driving southbound on Interstate 5 toward Mexico. The Kia vehicle he was driving was leased to him and Elesa Amirjanyan. Azatyan had $536 in cash, a bag of clothes, a SIM card holder with one of Azatyan's phone numbers written on it (-6077), and the keys to the black Santa Fe.

## V. Grigoryan and Mkhitaryan Make Incriminating Statements in Custody During a Recorded Conversation

Police informed Grigoryan he had been arrested for murder and attempted murder. They told him they believed he had organized the crimes and Azatyan had carried them out as the shooter. They said they had cell phone evidence placing him at the scenes of both crimes and showed him photographs of his minivan at the SpyShop and Rafik's apartment complex.

After giving Grigoryan that information, police transported him and Mkhitaryan to their arraignment on February 15, 2019, in an unmarked car wired with a recording device. Grigoryan and Mkhitaryan both made a number of incriminating statements. Grigoryan told Mkhitaryan, "[Azatyan] will take the responsibility for everything, bro. You will get out for sure." But Grigoryan lamented he would be "gone . . . for minimum 10-15 years," in part because "[t]hey consider me the organizer of

11

this all." He also regretted not leaving "a couple of hours earlier" because he "would have made it." Grigoryan said police had "the white car" with "[a]ll the locations that I have been" as well as "a picture of me driving it." When Mkhitaryan asked him about the white car and the black car, Grigoryan responded that police "don't know who was driving the black one and did what," but rather were "going on the second incident." Grigoryan also admitted "it's been so many months since" he drove the black car. Mkhitaryan stated that "your thing . . . the white one . . . has been at [7-Eleven]."

Because police had photos of Mkhitaryan and Grigoryan "together when [they] were buying the [tracking] device," Grigoryan believed it was futile for them to tell police they did not know each other. Rather, Grigoryan suggested they tell police they had planned to meet Azatyan at the restaurant to "have some food," but when they arrived "and saw that there were cops outside[,] we didn't go inside" and instead "drove to [Azatyan's] store" next to his residence. Mkhitaryan told Grigoryan he had "made a good plan." Grigoryan also suggested they tell police they purchased the GPS tracker for Azatyan so he could follow his wife; later, they concluded Mkhitaryan could plausibly deny knowledge of what Grigoryan had purchased at the SpyShop.

## PROCEDURAL HISTORY

On March 21, 2021, Grigoryan, Mkhitaryan, and Azatyan were charged with the murder of Tahmazyan (Pen. Code, § 187, subd. (a);[8] count 1) and the attempted premeditated murder of Rafik (§§ 187, subd. (a), 664, subd. (a); count 2). It was further alleged Tahmazyan's murder was committed by means of lying in wait. (See § 190.2, subd. (a)(15).) The information also alleged,

---

[8]     Undesignated statutory references are to the Penal Code.

12

with respect to both counts, Azatyan had used and personally discharged a firearm and had caused great bodily injury. (See § 12022.53, subds. (b)–(d).) Finally, it was alleged Grigoryan had previously been convicted of two serious felonies (§ 667, subd. (a)(1)) and two serious or violent felonies (§§ 667, subds. (b)–(j), 1170.12, subd. (b)).

Mkhitaryan pled guilty to voluntary manslaughter and attempted murder pursuant to a plea agreement. He is not a party to this appeal.

Grigoryan and Azatyan were tried by a jury. They were convicted on both counts, and the jury determined they intentionally killed Tahmazyan by means of lying in wait. However, the jury returned "not true" findings on the firearm allegations against Azatyan for both counts. The court heard and rejected Grigoryan's and Azatyan's motions for new trials, in part on the ground the verdicts were supported by substantial evidence.

In a bifurcated proceeding, Grigoryan admitted his prior felony convictions. The court granted in part his motion to strike those for sentencing purposes, but denied the motion with regard to section 667, subdivision (a)(1). (See §§ 667, subds. (b)–(j), 1170.12, subd. (b), 1385.) On September 11, 2023, Grigoryan and Azatyan were each sentenced to life in prison without the possibility of parole on count 1 and to a consecutive term of life in prison on count 2. In addition, Grigoryan received a determinate term of ten additional years in prison, five for each count, because of his prior convictions. (See § 667, subd. (a)(1).)

Both defendants timely appealed. (See § 1237, subd. (a); Cal. Rules of Court, rule 8.308(a).)

## DISCUSSION

## I. Substantial Evidence Supported the Defendants' Convictions

### A. Standard of Review

When we assess the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. . . . [W]e review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citation omitted (*Zamudio*); see also *People v. Gomez* (2018) 6 Cal.5th 243, 278 [court does not "resolve credibility issues or evidentiary conflicts"].)

### B. Substantial Evidence Supported Both of Azatyan's Convictions

#### 1. Azatyan Shot Both Victims

In general, " 'the testimony of a single witness is sufficient for the proof of any fact.' " (*People v. Avila* (2009) 46 Cal.4th 680, 703; cf. *People v. Najera* (2008) 43 Cal.4th 1132, 1136–1137 [listing exceptions not relevant here].) An eyewitness to Tahmazyan's murder and an eyewitness to Rafik's attempted murder each identified Azatyan as the shooter. That amounts to substantial evidence Azatyan was the direct perpetrator of both crimes. (See *People v. Miranda* (2011) 192 Cal.App.4th 398, 406–

14

407 (*Miranda*) [identification by one witness was sufficient].) Azatyan does not argue otherwise.[9]

Because sufficient evidence supported the jury's verdict finding Azatyan guilty of both crimes as a direct perpetrator, we need not and do not consider whether the evidence was also sufficient on an aiding and abetting theory. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331 [reversal warranted only if no substantial evidence supports the conviction on any theory].)

## 2. The Jury's "Not True" Findings on the Gun Use Enhancements Do Not Change Our Analysis

Azatyan's argument the evidence was insufficient on both counts is squarely premised upon his assumption the jury convicted him solely as an aider and abettor. In short, he argues: (1) the jury's "not true" findings on the gun use enhancements mean it necessarily determined "the People did not prove . . . Azatyan personally shot the victims"; (2) there is no dispute the victims were shot, so the jury must have found him guilty of aiding and abetting an unknown shooter; and (3) because the

---

[9]     Because the testimony of one witness is sufficient, we need not and do not discuss at length the rest of the evidence supporting the verdicts, which we have already described in the factual summary. Nevertheless, a surfeit of evidence supported the reasonable inference Azatyan shot both victims, including: (1) cell phone records placing him in the vicinity of both crimes; (2) evidence connecting Azatyan to the vehicles used in the crimes; (3) other eyewitness accounts of the shooter consistent with Azatyan's appearance;(4) incriminating statements Azatyan and others made in recorded conversations; and (5) Azatyan's apprehension while attempting to flee.

15

evidence was not sufficient to show he aided and abetted the crimes, his convictions must be reversed.

We reject Azatyan's assumption we are "bound by" the "not true" gun enhancement findings in analyzing whether substantial evidence supports his convictions. First, we have already explained " '[s]ufficiency-of-the-evidence review involves assessment by the court of whether the evidence adduced at trial could support *any rational determination of guilty* beyond a reasonable doubt.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 656, italics added; see also *Miranda*, *supra*, 192 Cal.App.4th at pp. 405–406.) Here, the evidence was sufficient to support Azatyan's guilt of both crimes beyond a reasonable doubt on a direct perpetrator theory. Our Supreme Court has cautioned us that our sufficiency of the evidence " 'review should be independent of the jury's determination that evidence on another count was insufficient.' " (*Lewis*, at p. 656.) Thus, we do not consider the jury's not true finding on the gun enhancements when reviewing the sufficiency of the evidence for the underlying crimes.

Second, Azatyan is wrong when he suggests the "not true" findings on the gun enhancements necessarily imply the jury must have convicted him of murder and attempted murder as an aider and abettor.[10] Our Supreme Court long ago rejected that notion. (*People v. Santamaria* (1994) 8 Cal.4th 903, 918–919 (*Santamaria*).) It is not our place to speculate about the theory underlying Azatyan's convictions because in California, "the jury need not decide unanimously whether defendant was guilty as

---

[10]    We also note the jury was not presented with an aiding and abetting theory of culpability for Azatyan; the People argued he was guilty because he shot the victims.

the aider and abettor or as the direct perpetrator." (*Santamaria*, at p. 918; see *People v. Quiroz* (2013) 215 Cal.App.4th 65, 74 [same].) And even assuming there was "a reasonable doubt in the minds of [some] jurors that defendant specifically used a [gun,] [that] *does not show the reverse, that the jury specifically found defendant was an aider and abettor*." (*Santamaria*, at p. 919.) That is, even if these verdicts could mean one (or more) jurors harbored reasonable doubt about who fired the gun at Tahmazyan and Rafik, that does not warrant Azatyan's conclusion "that the jury *specifically* found [he] did not use the [gun]." (*Id.* at p. 920.)

Azatyan's reliance upon cases reviewing jury instructions for harmless error is misplaced. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 7–8 [jury was instructed on two theories of guilt, only one of which was correct]; see also *Carella v. California* (1989) 491 U.S. 263, 270–271 (conc. opn. of Scalia J.) [discussing harmless error analysis for instructional error].) Azatyan's appeal neither challenges the jury instructions nor any issue to which harmless error review applies.

What we do know from the guilty verdicts on counts 1 and 2 is all jurors were unanimously convinced beyond a reasonable doubt of Azatyan's guilt for both murder and attempted murder. (See *Santamaria, supra*, 8 Cal.4th at p. 920.) For purposes of substantial evidence review, our task is simply to determine whether the evidence adduced at trial was sufficient to support that conclusion on any valid theory. (See *Zamudio, supra*, 43 Cal.4th at p. 357.) As we explained above in the Discussion, part I.B.1., it was.

## C. Substantial Evidence Supported Grigoryan's Conviction for the Murder of Tahmazyan (Count 1)

The parties agree Grigoryan was convicted of Tahmazyan's murder on an aiding and abetting theory. Grigoryan argues his conviction must be reversed because the evidence did not prove he was present at the scene, assisted the shooting, or instigated or advised the crime. Because we conclude substantial evidence supported the verdict, we reject his challenges.

### 1. Principles of Aiding and Abetting Culpability

Grigoryan repeatedly cites to *People v. Durham* (1969) 70 Cal.2d 171, 181, for the proposition an aider and abettor " 'must have *instigated or advised* the commission of the crime *or been present for the purpose of assisting in its commission.*' " To the extent he is arguing those are the only circumstances in which a defendant can aid and abet a crime, we disagree. Rather, "a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; see also *People v. Hin* (2025) 17 Cal.5th 401, 445 [aiding and abetting murder].)

"[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and

abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Grigoryan argues the evidence of his own actus reus was insufficient to show he assisted the murder.[11]

## 2. There Was Substantial Evidence Grigoryan Assisted Tahmazyan's Murder

Grigoryan's briefing essentially ignores the plethora of evidence introduced at trial showing he assisted the shooting of Tahmazyan by acting as a scout for the shooter, Azatyan.

First, evidence connected Grigoryan to the white minivan used as scout vehicle. He was seen driving it or riding in it on multiple occasions after Tahmazyan's murder, and he used it in the shooting of Rafik (the originally intended victim) several days later. His fingerprints were found on water bottles inside it.

Second, between 8:17 p.m. and 8:23 p.m. on the night of the murder, Grigoryan's phone connected to cell towers in the general vicinity of the restaurant. That was during the period the white Pacifica and the black Santa Fe were also in that area, circling the restaurant while Tahmazyan stood in the parking lot. Specifically, the Pacifica passed the restaurant about 8:15 p.m. About two minutes later, Grigoryan's phone connected with Azatyan's phone in the vicinity of the restaurant.[12] And two to three minutes after that, the Santa Fe passed the restaurant,

---

[11] Because Grigoryan has not challenged the People's evidence supporting the other two required areas, we assume that evidence was sufficient. (See *Tukes v. Richard* (2022) 81 Cal.App.5th 1, 12, fn. 5 ["A contention not appropriately raised in the opening brief . . . may be deemed forfeited."].)

[12] During the same period, multiple calls were made among all three defendants.

19

circled the block, stopped while Azatyan shot Tahmazyan, and sped off with him afterward.

From that evidence, the jury could reasonably conclude Grigoryan drove the white Pacifica that night to reconnoiter the scene for the purpose of helping Azatyan to identify an opportune time to shoot the victim. (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1066 [surveillance supported an inference of aiding and abetting murder].) Grigoryan points out there was no evidence he was in the parking lot at the moment shots were fired, and he reiterates that mere presence at the scene is not enough to show aiding and abetting. But that does not undermine our conclusion the jury could reasonably infer Grigoryan was in the Pacifica, surveilling the scene on Azatyan's behalf for the purpose of facilitating the murder. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 [among other things, jury could infer the defendant aided shooter by spotting potential targets]; *People v. Sawyer* (1967) 256 Cal.App.2d 66, 76 ["[a]n inference of aiding and abetting may reasonably be drawn from acting as a lookout"]; cf. *People v. Cooper* (1991) 53 Cal.3d 1158, 1168, fn. 12 [a getaway driver is an aider and abettor].)

Moreover, the jury could reasonably infer the three defendants discussed their murderous scheme in their many phone calls before, during, and after the crime. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1070–1071 [jury could reasonably infer the conversation between the defendant and confederate prior to the killing was about the murder], abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Grigoryan argues that conclusion is speculative because there is no evidence of the content of their conversations. Nevertheless, the constellation of calls—made both in the vicinity and around the time of the murder—combined with the trio's surveillance of

that scene and later of Rafik (and their subsequent attempt to murder him), plus incriminating statements they made in many conversations that *were* recorded, do more than " 'merely raise[] a possibility' " the trio was discussing the murder on the evening of October 13. (*People v. Bell* (2020) 47 Cal.App.5th 153, 180 [distinguishing a "reasonable inference" from "speculation"]; see *People v. Collins* (2025) 17 Cal.5th 293, 307 ["[s]uspicion is not evidence"].)

All of that amounted to substantial evidence supporting Grigoryan's conviction as an aider and abettor of Tahmazyan's murder.

## II. Substantial Evidence Supported the Jury's Lying-in-Wait Special Circumstance Finding on Count 1

### A. Standard of Review

"We analyze a sufficiency-of-the-evidence challenge to a special circumstance finding under the same standard applied to a conviction. . . ." (*People v. Mataele* (2022) 13 Cal.5th 372, 420 (*Mataele*); see also *Zamudio*, *supra*, 43 Cal.4th at p. 357.)

### B. There Was Substantial Evidence Azatyan Killed Tahmazyan by Means of Lying in Wait

"The ' "lying-in-wait special circumstance requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage. . . .' " ' " ' " (*People v. Parker* (2022) 13 Cal.5th 1, 58; see also § 190.2, subd. (a)(15).) It equally applies to an aider and abettor of such a murder. (*People v. Johnson* (2016) 62 Cal.4th 600, 630 (*Johnson*); see also § 190.2, subds. (a)(15) & (c).)

21

We conclude there was abundant evidence supporting each required circumstance to show Tahmazyan was shot by means of lying in wait.

### 1. Azatyan Concealed His Purpose

Grigoryan[13] suggests the shooter did not lie in wait because he "did not conceal his presence" or "lur[e] [the victim] to an isolated or secluded location under false pretenses." But the lying-in-wait special circumstance does not require that conduct. (See *Johnson*, *supra*, 62 Cal.4th at p. 631 ["[P]hysical concealment . . . is not required."].) Rather, " ' "[i]t is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct." ' " (*Id.* at p. 632.) The element may be shown "by either an ambush or by the creation of a situation where the victim is taken unawares *even though he sees his murderer*.' " (*People v. Morales* (1989) 48 Cal.3d 527, 555, disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459; see also *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 786 [victims were unaware of assailants hidden in bushes, who initially shot from bushes and then jumped out and fired].)

That is precisely what happened here. Azatyan arrived at the scene in the black Santa Fe about 8:20 p.m., several minutes after the white Pacifica scout vehicle and several minutes before the shooting. The Santa Fe circled the block, stopped in front of the restaurant, and Azatyan alighted and directly approached Tahmazyan on foot. No evidence suggests Tahmazyan knew he was being surveilled. (See *People v. Moon* (2005) 37 Cal.4th 1, 22 (*Moon*) [the defendant concealed his presence inside victim's

---

[13] Azatyan joins Grigoryan's arguments on this issue. (See Cal. Rules of Court, rule 8.200(a)(5).)

home].) Nor is there any indication Tahmazyan noticed Azatyan's approach in light of the crowd in the parking lot, let alone understood Azatyan's purpose in being there was to kill him. Thus, there was substantial evidence Azatyan's murderous intent and purpose were concealed from Tahmazyan, even after Azatyan had alighted from the Santa Fe and approached him. (See *Johnson*, *supra*, 62 Cal.4th at p. 632 [victim "did not necessarily expect that the execution would occur when he left the party with defendant to obtain drugs"]; *Mataele*, *supra*, 13 Cal.5th at p. 421 [the defendant shot victim by surprise when he got out of the car they were riding in with others on the pretext of going to a club].)

### 2. Azatyan Sufficiently Watched and Waited

"[T]he purpose of the watching and waiting element ' " 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " ' " ' " (*People v. Flinner* (2020) 10 Cal.5th 686, 749 (*Flinner*).) "[A] few minutes can suffice." (*Moon*, *supra*, 37 Cal.4th at p. 23.)

There was substantial evidence from which the jury could reasonably infer Azatyan watched and waited to determine the best time to attack his victim. The evidence showed the three defendants were surveilling the scene starting at least from 8:15 p.m.; they communicated with each other thereafter to ultimately conclude it was an opportune time to attack; and Azatyan personally surveilled the victim's location when he was slowly driven past the scene once, before returning to shoot him a few minutes later. (See *Flinner*, *supra*, 10 Cal.5th at p. 750 [victim's failure to try to evade the attack suggested the defendant watched and waited for best time to strike].)

Grigoryan argues there was insufficient evidence the killer watched and waited for an opportune time to strike because the shooter simply "spotted the victim standing outside of a restaurant, . . . turned his car around and parked . . . , got out of the car and approached the victim face to face in the middle of a large crowd . . . , and then shot the victim in front of 20 eyewitnesses." But that ignores Azatyan's reliance upon a scout car to surveil the scene in advance, and it also ignores Azatyan's vehicle slowly driving past the victim, circling the block, passing the location again, and stopping before he launched his attack. The jury was not required to credit Grigoryan's exculpatory interpretation of those facts. (See *People v. Byrd* (1954) 42 Cal.2d 200, 208–209 [jury need not credit the defendant's exculpatory story], overruled on other grounds by *People v. Green* (1956) 47 Cal.2d 209, 232.)

Thus, this is not a case like *People v. Nelson* (2016) 1 Cal.5th 513, where the court determined there was inadequate evidence of lying in wait. That defendant arrived at the location "where he had reason to believe the victims would be waiting to go to work[,] . . . came up behind [them] on foot to take them by surprise," and shot them. (*Id.* at p. 551.) The defendant committed the crime alone and did not surveil the scene beforehand. (*Id.* at p. 522.) Likewise, in *People v. Carter* (2005) 36 Cal.4th 1215, 1261–1262, there was evidence the defendant forced his entry into the victim's apartment, but no evidence he either did so before the victim returned home or lay in wait for her there. By contrast, this jury could reasonably infer from the evidence before it that Azatyan and his confederates reconnoitered the victim's location several times, over the course of at least several minutes, communicated their observations to each other, and jointly determined the time was ripe to attack.

### 3.  Azatyan Attacked Tahmazyan by Surprise from a Position of Advantage

" '[A] mere concealment of purpose' is not sufficient to establish lying in wait, since 'many "routine" murders are accomplished by such means.' " (*Flinner, supra*, 10 Cal.5th at p. 750.) But critical here is that the jury could infer Azatyan did more than simply conceal his purpose. Rather, the jury could conclude all three defendants knew the intended victim, Rafik, was at the restaurant, planned to be in that vicinity at that time in two separate cars (one to reconnoiter the scene on behalf of the shooter), and then circled the location in order to identify the best time to "launch[] ' " ' "a surprise attack" ' " ' on [the victim] from an advantageous position": while he was preoccupied speaking to a friend outside the restaurant in a large group and would not notice Azatyan's approach. (*Id.* at p. 751.) Attacking the victim outside the restaurant also facilitated Azatyan's unobstructed escape from the scene. The jury could reasonably infer the trio's actions were "part of the . . . plan to take the victim by surprise" by putting Azatyan "in a position of advantage." (*People v. Webster* (1991) 54 Cal.3d 411, 448.) And as already explained in the Discussion, part II.B.1, the jury could reasonably conclude Azatyan and his confederates were concealed from Tahmazyan (in their vehicles traveling on public roadways and alleys) while they surveilled him, putting them in an advantageous position. (See *Johnson, supra*, 62 Cal.4th at pp. 630, 633 [the victim was aware of assailants' presence in the alley, but assailants were in a position of advantage because the defendant concealed the purpose of going to the location].)

Moreover, even if Tahmazyan belatedly became aware of Azatyan's presence when Azatyan directly approached him and shot him at close range, that "does not defeat the inference" that

Azatyan's concealment of purpose put him in a position of advantage by which to take the victim by surprise. (See *Johnson*, *supra*, 62 Cal.4th at p. 633.) Indeed, the evidence shows "the shooting occurred shortly after" Tahmazyan would have realized Azatyan was in the parking lot, which implies a surprise attack from a position of advantage. (See *ibid.*; see also *Moon*, *supra*, 37 Cal.4th at p. 22 [the defendant concealed his purpose by refusing to answer the victim and then "suddenly pushed her down the stairs" in a surprise attack].)

## DISPOSITION

The judgment is affirmed.

RICHARDSON, J.

WE CONCUR:

CHAVEZ, Acting P. J.

GOORVITCH, J.*

---

*       Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.